NOT FOR PUBLICATION                                        (Doc. Nos. 33, 34)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | | |
|---|---|---|
| _____ | : | |
| K.J. and T.J on behalf of | : | |
| K.J., JR. et al., | : | |
| | : | |
| Plaintiffs, | : | Civil No. 14-145 (RBK/JS) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| GREATER EGG HARBOR | : | |
| REGIONAL HIGH SCHOOL | : | |
| DISTRICT BOARD OF | : | |
| EDUCATION et al., | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

**KUGLER**, United States District Judge:

      This matter comes before the Court on the Motions to Dismiss of Defendants New Jersey Department of Education and Commissioner Cerf (Doc. No. 33) and the Atlantic County Prosecutor's Office, Lauren Kirk, and Anne Crater (Doc. No. 34), Plaintiffs' Fourth Amended Complaint pursuant to Rule 12(b)(1) and (6).  In their Fourth Amended Complaint Plaintiffs assert several claims, including but not limited to 42 U.S.C. § 1983 claims, New Jersey Law Against Discrimination Claims, an American with Disabilities Act claim, and a New Jersey Civil Rights Act claim.  For the reasons stated herein, Defendants' Motions to Dismiss will be granted in part and denied in part.

## I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

This matter arises out of events which took place at a New Jersey high school days after the tragic shooting at Sandy Hook Elementary School in Newtown, Connecticut on December 14, 2012.  (Fourth Amended Complaint ("FAC") ¶ 19.)[2]  Three days after Sandy Hook, one of K.J., Jr.'s ("K.J.") teachers saw a drawing in K.J.'s sketchbook that concerned her.  When school officials reviewed K.J.'s other drawings they found a drawing of what appeared to be a weapon, which prompted them to detain K.J. and call the police.  The police searched K.J.'s home and found parts that might have been used to make the weapon depicted in the drawing.  Shortly thereafter, K.J. was arrested and placed in a juvenile detention facility, where he remained for over two weeks.  Upon his release, he was placed under house arrest and forced to wear an ankle monitor until, several months later, the judge presiding over his trial dismissed one of the charges entirely and found K.J. not guilty on the remaining counts.  During and as a result of these events, K.J. was deprived of at least fourteen months of high school education, and subject to multiple other constitutional and state law violations.

### (a)  The Parties

Plaintiffs are members of the Jones family, and are all residents of New Jersey.  (Id. ¶ A.) Keven Jones ("Kevin") and Theresa Jones ("Theresa") are the parents of K.J., and his siblings, K.J. and C.J. (the "Siblings") (collectively "Plaintiffs").  (Id.)

The Defendants in this action are many.  Beginning with the School Defendants, Greater Egg Harbor Regional High School Board of Education ("Egg Harbor") is a public school district

---

[1] On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must "accept all factual allegations as true and construe the complaint in the light most favorable to the Plaintiff."  Accordingly, the following facts are taken from Plaintiffs' Fourth Amended Complaint.  See Phillips v. Cnty. of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008).

[2] See generally James Barron, Nation Reels After Gunman Massacres 20 Children at School in Connecticut, N.Y. Times, Dec. 14, 2012, http://www.nytimes.com/2012/12/15/nyregion/shooting-reported-at-connecticut-elementary-school.html.

located in New Jersey.  (<u>Id.</u> ¶ B.)  Dr. Steve Ciccariello ("Ciccariello") is the Superintendent of

Schools at Egg Harbor.  (<u>Id.</u> ¶ C.)  John Ragan ("Ragan") is the District Supervisor of Special

Services, and is the Anti-Bullying Coordinator for Egg Harbor.  (<u>Id.</u> ¶ D.)  Erin Byrnes is a

school psychologist and Anti-Bulling Specialist at Cedar Creek High School ("Cedar Creek"), a

school in Egg Harbor.  (<u>Id.</u> ¶ E.)  James Reina ("Reina") is the Principal of Cedar Creek, (<u>id.</u> ¶

F), and Michael McGhee ("McGhee") is the Vice Principal and Supervisor of Special Education

at Cedar Creek.  (<u>Id.</u> ¶ H.)  Scott Parker ("Parker") is or was also Vice Principal for Cedar Creek,

and is the Anti-Bullying Liaison for Cedar Creek.  (<u>Id.</u> ¶ I.)  Christine Reina ("Christine") is the

Homebound Instruction Coordinator for Cedar Creek.  (<u>Id.</u> ¶ G.)  Megan Hallman ("Hallman")

was K.J.'s geometry teacher at Cedar Creek.  (<u>Id.</u> ¶ J.)  Gregory Ferree ("Ferree") is a German

teacher and Homebound instructor at Cedar Creek.  (<u>Id.</u> ¶ K.)  Paula Londono ("Londono") is a

guidance counselor employed at Cedar Creek.  (<u>Id.</u> ¶ M.)  Cori Koury ("Koury") was a case

manager on the Child Study Team at Cedar Creek, and Maggie Holmes ("Holmes") is also a case

manager on the Child Study Team at Cedar Creek.  (<u>Id.</u> ¶ N.)  Karen Cavalieri ("Cavalieri") is

the Supervisor of the Guidance Department at Cedar Creek.  (<u>Id.</u> ¶ O.)  Erin Hoban ("Hoban") is

an Art Teacher at Cedar Creek.  (<u>Id.</u> ¶ P.)  Stephanie Tarr ("Tarr") is an Event Coordinator with

Egg Harbor.  (<u>Id.</u> ¶ Q.)  Edward Ottepka ("Ottepka") is a school resource officer at Cedar Creek,

and Ramone Valentine ("Valentine") is a school security officer at Cedar Creek.  (<u>Id.</u> ¶ R.)

These defendants will be referred to collectively as the "School Defendants."

　　　　Plaintiff has also named several Defendants unaffiliated with Egg Harbor.  The

Prosecution Defendants include the Atlantic County Prosecutor's Office (the "Prosecutor's

Office"), located in Mays Landing, New Jersey (<u>id.</u> ¶ T), as well as Assistant Prosecutors Lauren

Kirk ("Kirk") and Anne Crater ("Crater"), who each work at the Prosecutor's Office (collectively

the "Prosecution Defendants"). (Id. ¶¶ U-V.) The Police Defendants include the Galloway

Police Department (the "Police Department"), an arm of the Township of Galloway in Galloway,

New Jersey (id. ¶ V), and Detectives McGinty ("McGinty"), Doyle ("Doyle"), Higbee

("Higbee"), and Hendrickson ("Hendrickson") of the Police Department (collectively the "Police

Defendants"). (Id.) Finally, the State Defendants include the New Jersey Department of

Education (the "NJDOE"), and Commissioner Cerf ("Cerf"), the Commissioner of the

Department of Education (collectively the "State Defendants"). (Id. ¶ Y.)

### a.  The Facts

Beginning in 2010, K.J. attended Cedar Creek, a magnet program for engineering. (Id. ¶

13.) Though gifted in the areas of art, chemistry, and engineering, (id.), K.J. was also a student

with disabilities who had been classified by Egg Harbor as "Other Health Impaired" for

Attention Deficit Disorder. (Id. ¶ 12.) As a result, K.J. had been given an Individualized

Education Program ("IEP"). (Id.) The IEP noted that K.J. doodled and drew in class, which

Plaintiffs allege allowed K.J. to express himself, as well as concentrate and focus in class. (Id. ¶

15.) To that end, K.J. carried a personal sketchpad with him at school, in which he kept his

drawings and doodles. (Id. ¶ 18.)

Prior to the events at issue in this case, K.J. only had one disciplinary incident while

attending Cedar Creek. (See id. ¶ 22.) On October 20, 2011, K.J. was removed from school and

suspended at first for ten days, and then until the end of January 2012, due to an incident on the

bus. (Id. ¶ 16.) Plaintiffs do not describe the event that took place on or around October 20,

2011. K.J. was apparently evaluated as a result of the incident by Dr. Hewitt, Egg Harbor's

psychiatrist, on October 26, 2011. (Id. ¶ 17.) Based on his review of K.J., Dr. Hewitt

determined K.J. was not a danger to himself or others, and that K.J. had Asperger's Syndrome. (Id.)

On December 14, 2012, a tragic shooting occurred at Sandy Hook Elementary School in Newtown, Connecticut. (Id. ¶ 19.) Three days later, on December 17, 2012, Hallman noticed a drawing of a "spaceman" K.J. was sketching during geometry class. (Id. ¶ 20.) Based on Hallman's concern about the content of K.J.'s drawings, he was called out of class by McGhee and taken to the Vice Principal's office late the next day, December 18, 2012. (Id. ¶ 21.) While K.J. was in the Vice Principal's office he was repeatedly told by McGhee that he was not in trouble, though Valentine, the school safety officer, remained in or around McGhee's office the entire time. (Id. ¶ 23.) McGhee allegedly manipulated K.J. into showing McGhee the drawings in K.J.'s sketchpad by leading K.J. to believe that McGhee was genuinely interested in K.J.'s artwork and designs. (Id. ¶ 24.) Based on McGhee's supposed interest, K.J. proudly showed McGhee his drawings. (Id.)

In K.J.'s sketchpad there was an updated drawing of a superhero glove with a flame coming out of it, a concept drawing which K.J. started two years earlier based on the Ironman movie.[3] The drawing of the glove was done solely at K.J.'s home, not at school, and was contained in K.J.'s personal, private sketchbook. (Id. ¶ 26.) K.J. never intended for anyone to see the glove drawing. (Id. ¶ 25.)

After reviewing the drawings in K.J.'s sketchbook, McGhee decided to keep K.J. in his office. (Id. ¶ 27.) McGhee also called Theresa and informed her that K.J. was in his office, but that K.J. was not in trouble. (Id. ¶ 28.) At no point during McGhee's conversation with Theresa was she informed that K.J. was in trouble at school. (Id.) While McGhee was speaking with

---

[3] See generally IRON MAN (Paramount Pictures 2008).

5

Theresa on the phone he also apparently contacted the local police department and kept Theresa on the phone until the police arrived at her home.  (Id. ¶ 29.)  The fire department, EMS, and bomb squad also arrived at Theresa's home soon after the local police.  (Id.)  Plaintiffs' home was searched by the police with Kevin's consent.  (Id. ¶ 31.)  Plaintiffs allege this consent was only given because McGhee "deceived [Theresa] into believing that their son was not in any trouble."  (Id.)  During their search, the police found items such as wires, thermite chemical, and switches, which were apparently part of K.J.'s science and engineering homework.  (Id. ¶ 32.)

Around this time, Reina also apparently issued an "All Call" to all families in the school district notifying them of what occurred.  (Id. ¶ 30.)  This "All Call" went out with the knowledge of Ciccariello.  (Id.)  Reina also allegedly had bomb-sniffing dogs go through the school at that time.  (Id.)  While the police were searching Plaintiffs' home, K.J. was allegedly transported somewhere by Ottepka.  (Id. ¶ 33.)  Though Plaintiffs do not indicate where Ottepka transported K.J., he apparently did so in a private car, without any other adult present, and without notifying K.J.'s parents.  (Id.)

At some point after the search of Plaintiffs' home, the Prosecutor's Office was contacted by the Police Department.  (Id. ¶ 34.)  K.J. was charged with a crime and a judge ordered that K.J. be placed in the Harborfield Juvenile Detention Center ("Harborfield"), where he spent seventeen days.  (Id.)  While at Harborfield, K.J. was strip searched and cavity searched.  (Id.)  Upon K.J.'s release from Haborfield he was placed under house arrest.  (Id. ¶ 36.)  This meant K.J. was confined to his home, and had to wear an ankle bracelet from early January 2013 until May 23, 2013.  (Id.)

A criminal trial was held before Judge Jackson on May 21 and May 22, 2013.  (Id. ¶ 37.)  Before the trial began, Judge Jackson dismissed the second charge against K.J.  (Id.)  After

expert testimony was taken, Judge Jackson found K.J. not guilty of the remaining charges against him because K.J. did not have the requisite malicious intent needed to substantiate the charges. (Id. ¶ 38.)  Judge Jackson also determined, based on expert reports from the State and on behalf of K.J., that the glove device found in K.J.'s home would not constitute a weapon, even upon completion.  (Id.)

Plaintiffs allege that the School Defendants attempted to expel K.J. from school at some point prior to March 2014, because he had been arrested in connection with the December 18, 2012, incident.  (Id. ¶¶ 35, 42.)  K.J. was also denied his right to return to school by the School Defendants.  (Id. ¶ 40.)  Instead, K.J. was on home instruction while under house arrest.  (Id. ¶ 41.)  It was not until March 2014, after an Administrative Law action and this action had been filed, that Egg Harbor allowed K.J. to return to school on a limited basis.  (Id. ¶ 42.)  In total, K.J. was prevented from returning to school from December 2012 until March 2014.  (Id.)

Additionally, during his period of house arrest, K.J.'s German tutor apparently saw another one of K.J.'s drawings and attempted to confiscate it from Plaintiffs' home, on orders from Reina and Parker.  (Id. ¶ 40.)  That same spring of 2013 Egg Harbor notified the venue for a Cedar Creek class trip to Boston that K.J. was a "behavior issue," which ultimately prevented him from attending that field trip.  (Id. ¶ 43.)  Finally, it is generally averred that Egg Harbor harassed, intimidated, bullied, retaliated against, and cyber-bullied K.J., failed to comply with the mandatory investigation requirements under the New Jersey Anti-Bullying Bill of Rights, and created a hostile school environment.  (Id. ¶ 44.)

On the basis of the aforementioned facts, Plaintiffs bring twenty-five claims for relief. They are as follows: a claim for violation of Section 504 of the Rehabilitation Act (Count I); a claim for violation of the Americans with Disabilities Act (the "ADA") and the Americans with

Disabilities Amendment Act (the "ADAA") (Count II); a claim for violation of the New Jersey

Civil Rights Act (the "NJCRA") (Count III); a 42 U.S.C. § 1983 claim for violating K.J.'s Fourth

Amendment rights (Count V);[4] a § 1983 claim for violating K.J.'s First Amendment rights

(Count VI); a § 1983 claim for violating K.J.'s Procedural Due Process rights under the

Fourteenth Amendment (Count VII); a § 1983 claim for violating the Equal Protection clause of

the Fourteenth Amendment (Count VIII); a § 1983 claim for maintaining a custom or practice,

and showing deliberate indifference to K.J.'s rights under the Constitution (Count IX); a § 1983

claim for deliberate indifference to K.J.'s rights under the Constitution (Count X); a § 1983

claim for failure to properly hire, train, and supervise, violating K.J.'s rights under the

Constitution (Count XI); a § 1983 and 42 U.S.C. § 1981 claim for false arrest and false

imprisonment (Count XII); a § 1983 claim for malicious and unconstitutional prosecution (Count

XIII); a 42 U.S.C. § 1985 claim for conspiracy (Count XIV); a claim for violation of the New

Jersey Anti-Bullying Bill of Rights Statute (the "NJ ABBRS") and Egg Harbor's Anti-

Harassment, Intimidation, Bullying, and Retaliation Policy (Count XV); a claim for violating the

New Jersey Law Against Discrimination (the "NJLAD") based on K.J.'s disability (Count XVI);

a claim for violating the NJLAD by creating a hostile learning environment (Count XVII); a

claim for violating the NJLAD by aiding and abetting the discriminatory actions of others (Count

XVIII); a claim for violating the NJLAD via retaliation (Count XIX); a claim for vicarious

liability (Count XX); a claim for intentional infliction of emotional distress ("IIED") (Count

XXI); a claim for negligent infliction of emotional distress ("NIED") (Count XXII); a claim for

defamation, libel, and slander (Count XXIII); a claim for violating Plaintiffs' right to be free

from false light and invasion of privacy under the Fourteenth Amendment and the common law

---

[4] Though Plaintiffs included a Count IV, it only alleges that all Defendants are "persons" for purposes of the subsequent § 1983 claims, and contains no substantive allegations of misconduct on behalf of any defendant.

(Count XXIV); a claim for negligence, gross negligence, and respondeat superior under the New Jersey Tort Claims Act (the "TCA") (Count XXV); and a claim for injunctive and declaratory relief to enforce K.J.'s Due Process rights under the Individuals with Disabilities Act (the "IDEA") (Count XXVI).  (See generally FAC.)

**(b) Procedural History**

Sometime in late 2013 or early 2014, Plaintiffs filed a "Due Process action" and Request for Emergent Relief in the Administrative Law Forum in New Jersey to address some of Plaintiffs' issues concerning his educational rights.  (See id. ¶ 6.)  The Request for Emergent Relief was withdrawn when the parties reached a temporary limited settlement agreement encompassing the period until the end of the school year in 2014.  (Id. ¶ 7.)  There was a Due Process hearing date scheduled for June 23, 2014, but the administrative trial was still unscheduled at the time the FAC was filed.  (Id.)  On August 21, 2013, Plaintiffs filed a Notice of Tort Claims, and on February 28, 2014, Plaintiffs filed an Amended Notice of Tort Claims. (Id. ¶ 11.)

The present action was commenced on January 9, 2014, when Plaintiffs filed their original Complaint.  (Doc. No. 1)  The original Complaint was amended four times, including on January 21, 2014, (Amended Complaint (Doc. No. 5)), February 5, 2014, (Second Amended Complaint (Doc. No. 7)), April 15, 2014, (Third Amended Complaint (Doc. No. 17)), and October 14, 2014.  (FAC (Doc. No. 32).)  The FAC was filed pursuant to the June 20, 2014, Order of this Court, in which Plaintiffs' Motion to Amend the Third Amended Complaint was granted and the Motions to Dismiss the Third Amended Complaint, filed by certain School Defendants and the Prosecution Defendants, were dismissed as moot.  (Doc. No. 32.)

Shortly after the FAC was filed, the State Defendants filed a Motion to Dismiss the FAC. (Doc. No. 33.)  Three days later, the Prosecution Defendants filed their own Motion to Dismiss the FAC.  (Doc. No. 34.)  Because the pending motions have been briefed by the parties, the Court proceeds to its discussion of merits.[5]

## II.   LEGAL STANDARD

Defendants move to dismiss Plaintiffs' claims based on lack of subject-matter jurisdiction under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6).  "When a motion under Rule 12 is based on more than one ground, the court should consider the 12(b)(1) challenge first because if it must dismiss the complaint for lack of subject matter jurisdiction, all other defenses and objections become moot."  In re Corestates Trust Fee Litig., 837 F. Supp. 104, 105 (E.D. Pa. 1993).

Pursuant to Federal Rule of Civil Procedure 12(b)(1), a complaint may be dismissed for lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  Generally, where a defendant moves to dismiss under Rule 12(b)(1) for lack of subject-matter jurisdiction, the plaintiff bears the burden of proving by a preponderance of the evidence that the Court has subject matter jurisdiction.  See Gould Elecs. Inc. v. United States, 220 F.3d 169, 178 (3d Cir. 2000).

---

[5] In addition to their Opposition Brief to the State Defendants' Motion to Dismiss, Plaintiffs submitted a supplemental brief in further opposition.  (Doc. No. 37.)  While Plaintiffs' opposition brief to the State Defendants' Motion to Dismiss and supplemental brief appear to exceed the forty page limit for briefs set forth in L. Civ. R. 7.2(b) when combined, the sum total of the pages not containing tables of contents or the tables of authorities comes just within the forty page limit.  See L. Civ. R. 7.2(b) (noting that pages included for the table of contents and authorities are excluded from the forty page limit placed on briefs).  Though technically falling within the page limit set forth in Rule 7.2, Plaintiffs seemingly violate the spirit of the Federal Rules and the Local Rules by attempting to add arguments left out of their original opposition papers by filing a supplemental brief.  Moreover, Plaintiffs did not obtain permission from the Court to file a supplemental brief.  Cf. L. Civ. R. 7.1(d)(6) (rule governing permissive sur-replies); L. Civ. R. 7.2(b) (permitting over-length briefs only with "special permission of the Judge of Magistrate Judge" prior to the submission of the brief).  Though the Court warns Plaintiffs against making future supplemental submissions without leave, it will accept and review Plaintiffs' supplemental brief for purposes of deciding the present motions.

A district court may treat a party's motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1) as either a facial or factual challenge to the court's jurisdiction. Gould Elecs., 220 F.3d at 176.  "In reviewing a facial attack, the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." Id. (citing PBGC v. White, 998 F.2d 1192, 1196 (3d Cir. 1993)). "In reviewing a factual attack, the court may consider evidence outside the pleadings." Gould Elecs., 220 F.3d at 176 (citing Gotha v. United States, 115 F.3d 176, 178-79 (3d Cir. 1997)); see United States ex rel. Atkinson v. Pa. Shipbuilding Co., 473 F.3d 506, 514 (3d Cir. 2007).  A district court has "substantial authority" to "weigh the evidence and satisfy itself as to the existence of its power to hear the case." Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).  "[N]o presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." Id.

Although courts generally treat a pre-answer motion under Rule 12(b)(1) as a facial challenge, see Cardio-Med. Assoc., Ltd. v. Crozer-Chester Med. Ctr., 721 F.2d 68, 75 (3d Cir. 1983), a "factual challenge under Rule 12(b)(1) may be made prior to service of an answer" if the defendant contests the plaintiff's allegations. Knauss v. U.S. Dept. of Justice, Civ. No. 10-2636, 2010 WL 3986183, at *2 (E.D. Pa. Oct. 7, 2010) (citing Berardi v. Swanson Mem'l Lodge No. 48 of Fraternal Order of Police, 920 F.2d 198, 200 (3d Cir. 1990)).  When a defendant raises a factual challenge to jurisdiction, the plaintiff bears the burden of establishing jurisdiction. Gould Elecs., 220 F.3d at 176-77.

Rule 12(b)(6) allows a court to dismiss an action for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).  When evaluating a motion to dismiss, "courts

accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (quoting Phillips, 515 F.3d at 233). In other words, a complaint is sufficient if it contains enough factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). It is not for courts to decide at this point whether the moving party will succeed on the merits, but "whether they should be afforded an opportunity to offer evidence in support of their claims." In re Rockefeller Ctr. Prop., Inc., 311 F.3d 198, 215 (3d Cir. 2002). Yet, while "detailed factual allegations" are not necessary, a "plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" Twombly, 550 U.S. at 555; see also Iqbal, 556 U.S. at 678-79.

To make this determination, a court conducts a three-part analysis. Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010). First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Id. (quoting Iqbal, 556 U.S. at 675). Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Santiago, 629 F.3d at 131 (quoting Iqbal, 556 U.S. at 680). Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." Santiago, 629 F.3d 131 (quoting Iqbal, 556 U.S. at 680). This plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common

sense." Iqbal, 556 U.S. at 679.  A complaint cannot survive where a court can only infer that a claim is merely possible rather than plausible.  Id.

## III.   DISCUSSION

### (a) State Defendants

The State Defendants moved to dismiss Plaintiffs' § 1983 claims, and Plaintiffs' claims sounding in state statutory and common law on the basis of sovereign immunity.  They also moved to dismiss Plaintiffs' Individuals with Disabilities Act ("IDEA"), Rehabilitation Act, and ADA claims as moot, due to the resolution and settlement of their claims in the administrative forum.  Finally, they moved to dismiss the remaining claims against Cerf in his individual capacity for failure to state a claim.

As an initial matter, Plaintiffs concede that they did not intend to assert claims against the NJDOE in Counts IV-XIV, (Pls.' Opp'n to State Defs.' Mot. to Dismiss ("Opp'n to State Defs.") at 18), and Counts XV-XXV (Id. at 24.)[6]  Plaintiffs also admit that, to the extent a claim is asserted against the NJDOE in Count III, that claim would be barred by Eleventh Amendment

---

[6] Plaintiffs seemingly take a contradictory position in their supplemental brief, arguing that their TCA claim in Count XXV is not barred by sovereign immunity.  (See Pls.' Suppl. Br. at 5-6.)  In support of this position, Plaintiffs cite a District of New Jersey case which held that the TCA provides a private cause of action against public entities under a theory of respondeat superior.  (Id. (citing L.S. v. Mt. Olive Bd. of Educ., 765 F. Supp. 2d 648, 665 (D.N.J. 2011)).)  Though L.S. offers no discussion of whether the TCA was intended to abrogate the State's sovereign immunity in federal court, this Court notes that the more persuasive position of the courts in this Circuit is to the contrary.  In two non-precedential opinions the Third Circuit has held that the TCA did not waive sovereign immunity in federal court proceedings.  See Hyatt v. County of Passaic, 340 Fed. App'x 833, 837 (3d Cir. 2009); Mierzwa v. United States, 282 Fed. App'x 973, 976 (3d Cir. 2008).  The cases in this District generally follow the Hyatt holding when confronted with the same issue.  See Brown ex rel. Payton v. Ancora Psychiatric Hosp., Civ. No. 11-7159, 2012 WL 4857570, at *2 (D.N.J. Oct. 11, 2012) (citing Hyatt and holding that the TCA does not constitute an Eleventh Amendment waiver where it does not expressly permit suit in federal court); Hilburn v. Dept. of Corr., , , at *7 (D.N.J. Feb. 23, 2010) (noting that the TCA permits suits against New Jersey in state court, but did not waive the State's Eleventh Amendment immunity from suits in federal court) (citing Hyatt, 240 Fed. App'x at 837; Port Authority Trans-Hudson Corp. v. Feeney, 495 U.S. 299, 306 (1990)); see also NJSR Surgical Center, L.L.C. v. Horizon Blue Cross Blue Shield of N.J., 979 F. Supp. 2d 513, 520 (D.N.J. 2013) (applying the Third Circuit's reasoning in Hyatt to hold that New Jersey's Contractual Liability Act did not waive sovereign immunity under the Eleventh Amendment).  Accordingly, to the extent Plaintiffs recede from their original position in their opposition brief regarding the NJDOE's immunity from state law claims, the Court finds their arguments in the supplemental brief to be without merit.

sovereign immunity.  (Id.)  This leaves only Counts I-II and XXVI remaining against the

NJDOE.  Further, Plaintiffs concede that only Counts I-II and XXVI are asserted against Cerf in

his official capacity, and Counts XV, XVII, and XVIII are not asserted against Cerf in any

capacity.  (Id.)  Thus, Counts I-II and XXVI remain against Cerf in his official capacity, and all

Counts except XV, XVII, and XVIII remain against Cerf in his individual capacity.

### (i)   Rehabilitation Act (Count I) and ADA (Count II)

To state a claim for a violation of Section 504 the Rehabilitation Act, a plaintiff must

show that (1) he is a "handicapped individual," (2) he is "otherwise qualified" for participation in

the program, (3) the program receives "federal financial assistance," and (4) he was "denied the

benefits of" or "subject to discrimination" under the program.  29 U.S.C. § 794(a); see also

Nathanson v. Med. Coll. of Pa., 926 F.2d 1368, 1380 (3d Cir. 1991).  Similarly, a plaintiff may

maintain a claim for a violation of the ADA by showing the same elements, minus the

requirement that the program receive federal financial assistance, but with the requirement that

the program or services be provided by a "public entity."  See 42 U.S.C. § 12132 ("Subject to the

provisions of this subchapter, no qualified individual with a disability shall, by reason of such

disability, be excluded from participation in or be denied the benefits of the services, programs,

or activities of a public entity, or be subjected to discrimination by any such entity."); see also

Helen L. V. DiDario, 46 F.3d 325, 332 (3d Cir. 1995) (noting that the ADA "extend[ed] section

504's anti-discrimination principles to public entities.")

While Section 504 and the ADA provisions apply to programs receiving federal financial

assistance and public entities, respectively, they do not create individual liability for public

employees.  See A.W. v. Jersey City Pub. Sch., 486 F.3d 791, 804 (3d Cir. 2007) ("Suits may be

brought pursuant to Section 504 against recipients of federal financial assistance, but not against

individuals.") (citing <u>Emerson v. Thiel Coll.</u>, 296 F.3d 184, 190 (3d Cir. 2002)); <u>Calloway v. Boro of Glassboro Dep't of Police</u>, 89 F. Supp. 2d 543, 557 (D.N.J. 2000) (citing cases from other districts and circuits for the proposition that "individual defendants cannot be held liable for violations of Title II of the Disability Act"); <u>see also</u> <u>Emerson</u>, 296 F.3d at 189 (citing <u>Walker v. Snyder</u>, 213 F.3d 344, 346 (7th Cir. 2000) (finding that "the ADA addresses its rules to employers, places of public accommodation, and other organizations, not to the employees or managers of these organizations"), and <u>Garcia v. S.U.N.Y. Health Sciences Ctr.</u>, 280 F.3d 98, 107 (2d Cir. 2001) (holding that individuals are not liable under Title II), approvingly, and noting that the Rehabilitation Act and the ADA are "generally … interpreted consistently.")

Finally, while Plaintiffs may request injunctive relief for violations of Section 504 and the ADA, they are also entitled to seek compensatory damages and other relief "'available in a private cause of action brought under Title VI of the Civil Rights Act of 1964.'" <u>A.W.</u>, 486 F.3d at 804 (quoting <u>Barnes v. Gorman</u>, 536 U.S. 181, 185 (2002)).

Plaintiffs allege that K.J. is disabled within the meaning of both Section 504 and the ADA, as he has been diagnosed with Asperger's Syndrome and Attention Deficit Hyperactivity Disorder, and due to his disabilities he has a substantial limitation on major life activities of learning and social skills.  (FAC ¶ 49; <u>see also</u> <u>id.</u> ¶¶ 54, 57 (incorporating into ADA claim the elements pled in Plaintiffs' Section 504 claim).)  They also claim that K.J. was otherwise qualified to participate "in school activities," (<u>id.</u> ¶ 49), and "[Egg Harbor's] educational program."  (<u>Id.</u>; <u>id.</u> ¶ 51; <u>see also</u> <u>id.</u> ¶ 58.)  With respect to the State Defendants, Plaintiffs contend that the NJDOE and Cerf, by allowing the Office of Administrative Law and the Office

of Special Education to delay the Due process action filed by Plaintiffs in the administrative

forum, violated K.J.'s rights "due to his disabilities." (Id. ¶ 52; see also id. ¶ 59.)[7]

The State Defendants ask the Court to dismiss Counts I and II because they are moot. In

support of their position the State Defendants construe Plaintiffs' Section 504, ADA, and IDEA

claims against them as being "based on the premise that the IDEA administrative due process

hearing brought by Plaintiffs to adjudicate their IDEA claims [ ] failed to result in a decision

within the timelines prescribed by the IDEA regulations." (State Defs.' Br. at 17.) Because

Plaintiffs apparently entered into a voluntary settlement with Egg Harbor on June 18, 2014,

agreeing to resolve their IDEA claims, the State Defendants contend that any issue regarding the

adjudication for the administrative matter is moot. (Id. at 18.) In other words, they argue, the

Court "cannot offer any effective relief in this matter." (Id.)

While the State Defendants' position has merit with regards to Plaintiffs' attempt to

obtain injunctive relief in Count XXVI,[8] Plaintiffs have sought a different type of relief in

Counts I and II – monetary damages. As noted above, compensatory damages may be

appropriate for Section 504 and ADA claims, and Plaintiffs have sought compensatory damages

for both the alleged Section 504 and ADA violations. (FAC ¶¶ 53, 60.) Though Plaintiffs frame

their opposition as turning on whether compensatory damages would be available in the

administrative forum, (see Opp'n to State Defs. at 26), the Court instead construes Counts I and

II as seeking something separate from the injunctive relief sought in Count XXVI, and

---

[7] Because the State Defendants have not raised a Rule 12(b)(6) challenge to Counts I and II, the Court is constrained to only note that Plaintiffs have not pled that the State Defendants were public entities in Count II. Normally this deficiency would be grounds for a dismissal under Rule 12(b)(6). However, the Court cannot sua sponte raise grounds for dismissal where Plaintiffs have not had the opportunity to respond to those grounds. Cf. Oatess v. Sobolevitch, 914 F.2d 428, 430 n.5 (noting that the Third Circuit position is that "a district court might, sua sponte, raise the issue of the deficiency of a complaint under Rule 12(b)(6), so long as the plaintiff is accorded an opportunity to respond.") (citing Roman v. Jeffes, 904 F.2d 192, 196 (3d Cir. 1990); Dougherty v. Harper's Magazine Co., 537 F.2d 758, 761 (3d Cir. 1976)).
[8] See supra at Part III.(a)(ii).

16

presenting a different legally cognizable interest.  See Donovan ex rel. Donovan v.
Punxsutawney Area Sch. Bd., 336 F.3d 211, 216 (3d Cir. 2003) (quoting Powell v. McCormack,
395 U.S. 486, 496 (1969)).  As such, the Court declines to dismiss Counts I and II against
NJDOE and Cerf, in his official capacity, on the basis of mootness.

      However, because Cerf is not a proper defendant to Plaintiffs' Section 504 or ADA
claims when sued in his individual capacity, as he is neither the recipient of federal funds or a
public entity, the Court will dismiss Counts I and II against Cerf in his individual capacity.
Additionally, because Plaintiffs' decision to file suit against Cerf in his official capacity is
duplicative of their suit against the NJDOE, see Hafer v. Melo, 502 U.S. 21, 25 (1991) ("Suits
against state officials in their official capacity [ ] should be treated as suits against the State"), the
Court will dismiss all claims against Cerf in his official capacity as being duplicative of those
claims asserted against the NJDOE.

### (ii)  IDEA (Count XXVI)

      In their request for injunctive relief pursuant to the IDEA, Plaintiffs describe the actions
taken by the State Defendants which allegedly delayed Plaintiffs' Due Process adjudication in
the administrative forum, and contend that these actions violated various provisions of the IDEA
and related federal and state regulations.  (See generally FAC Count XXVI.)  Based on these
allegations, Plaintiffs seek injunctive relief to compel the NJDOE to promptly resolve Plaintiffs'
Due Process claim and Request for Emergent Relief.  (See id. ¶ 348 (requesting that the Court
grant "injunctive, declarative, and prospective relief to ensure that [the violations of the IDEA]
do not continue").)

      The State Defendants argue that this claim has been rendered moot by the settlement
reached on June 18, 2014, in the administrative forum.  (See State Defs.' Br. at 17; Ex. A to

Jones Cert., Decision of A.L.J. Gorman Approving Settlement ("Settlement Decision").)[9]  By its

terms, the agreement settled Plaintiffs' educational claims pursued under the IDEA in the

administrative forum and disposed of all issues between Plaintiffs and Egg Harbor in those

actions.  Due to this settlement, the State Defendants claim that this Court can no longer order

effective relief.  (State Defs.' Br. at 18-19).  The Court agrees.  Because Plaintiffs voluntarily

settled their claims in the administrative forum, prior to a final adjudication on the merits, such a

final decision will never be forthcoming.  In other words, this Court cannot order that the State

Defendants comply with the requirements of the IDEA to ensure that Plaintiffs' Due Process

claim is timely heard, as that claim has now been disposed of voluntarily.  See Blanciak v.

Allegheny Ludlum Corp., 77 F.3d 690, 698-99 (3d Cir. 1996) ("If developments occur during the

course of adjudication that eliminate a plaintiff's personal stake in the outcome of a suit or

prevent a court from being able to grant the requested relief, the case must be dismissed as

moot.")

     Plaintiffs' argument in opposition only confirms that their request for injunctive relief in

Count XXVI is moot.  The crux of their position is that the State Defendants were responsible for

supervising and enforcing compliance with the IDEA and the related regulations, (Opp'n to State

Defs.' at 28-29), and they failed to ensure that Plaintiffs' Due Process hearing was timely

resolved in this case.  (Id. at 29.)  Plaintiffs do not cite any provisions within the IDEA

authorizing a penalty for a state agency's failure to enforce the requirements of the IDEA.

Barring some other right to relief, the fact that the Due Process hearing was voluntarily

---

[9] Because the question of mootness goes to this Court's subject matter jurisdiction, and is properly raised on a Rule 12(b)(1) attack, the Court may examine evidence outside the pleadings, such as the attached Settlement Decision. Gould Elecs., 220 F.3d at 176 (citing Gotha, 115 F.3d at 178-79).

terminated means the State Defendants have no further responsibility to enforce the provisions of the IDEA cited by Plaintiffs in this matter.

However, Plaintiffs attempt to save their IDEA claim by arguing that the State Defendants have exhibited "systemic flaws, delays, and failures," which could not be addressed in the administrative forum.  (Id. at 30.)  To the extent Plaintiffs sought to remedy these alleged "systemic failures" via injunctive relief, the Court finds that Plaintiffs' voluntary resolution of their Due Process action moots such a claim.  There is simply nothing further the Court can order which would affect the fairness of the underlying administrative proceedings.  If Plaintiffs complaint of "systemic failures" is meant to include likely future violations, or other similarly situated Plaintiffs, the Court finds no support for such claims in the FAC.  (See id. at 30-33.) There are no allegations which suggest that Plaintiffs purport to represent a class of individuals, and Plaintiffs cannot amend their FAC to that effect in their opposition papers.  Nor have Plaintiffs presented any facts which suggest that they have a reasonable expectation that they would be subject to the same issue of delay to their Due Process hearing in the future.  See N.J. Turnpike Auth. v. Jersey Cent. Power and Light, 772 F.2d 25, 31 (3d Cir. 1985) (noting that the "capable of evading review" exception to the mootness doctrine is "triggered where two elements are combined: (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party would be subjected to the same action again.") (citing Murphy v. Hunt, 455 U.S. 478, 482 (1982)).[10]  The only remaining interpretation of Plaintiffs' argument put forth in their opposition papers is that they are actually attempting to recast a procedural or substantive

---

[10] Plaintiffs also have not pled any facts which suggest their IDEA litigation was too short to be fully litigated prior to its cessation or expiration, see N.J. Turnpike, 772 F.2d at 31, but have instead at least suggested the opposite. Instead, Plaintiffs take issue with the delay in their Due Process proceedings in the administrative forum.

due process claim in the guise of their request for injunctive relief under the IDEA.  Such claim

may be cognizable under § 1983, but Plaintiffs have not pled that claim in Count XXVI.

Accordingly, Count XVVI is dismissed as moot against the NJDOE and Cerf, in his

official and individual capacity.

### (iii)   Counts III-XIV, XVI, and XIX-XV

Plaintiffs maintain that the § 1983 and state law claims are asserted against Cerf in his

individual capacity.  (Opp'n to State Defs. at 23-25.)  Defendants argue that the FAC does not

actually assert the § 1983 and state law claims against Cerf in his individual capacity, and even if

it is construed to assert such claims, there is no factual support in the FAC for those claims

against Cerf.  (State Defs.' Br. at 12-13, 16-17.)

Based on the actual language in the FAC, there is no indication that Plaintiffs have

attempted to state claims against Cerf in his individual capacity.  Any and all references to Cerf

in the FAC are made in conjunction with a reference to the NJDOE, (FAC ¶¶ Y, 52, 59, 71, 222,

345, 347, 351), and most of the references to Cerf include the phrase "or his successor."  (Id. ¶¶

71, 76, 222, 345, 347, 351.)  This suggests that the allegations against Cerf are equally against

the NJDOE and its acting Commissioner, which is indicative of suing an official in his or her

official capacity.  Moreover, Cerf is never referred to in his individual capacity, a fact that is

significant, considering the other twenty-four individually named defendants were named in both

their "individual and official capacities."  (See generally id. ¶¶ C-X.)  Taken as a whole, the FAC

gives no indication that Cerf is a party to this action in his individual capacity.

While the failure to actually add Cerf in his individual capacity is sufficient for this Court

to dismiss the remaining claims,  it is worth noting that the State Defendants are also correct that

Plaintiffs have failed to allege any wrongdoing on Cerf's behalf that would give rise to liability,

had he been named in his individual capacity.  The only additional allegations against Cerf, aside

from those set forth in the Section 504, ADA, and IDEA claims, are that the NJDOE and Cerf

denied K.J. access to school in violation of the NJCRA, (id. ¶ 71), and the NJLAD.  (Id. ¶ 222.)

These two allegations are nothing more than legal conclusions, and the FAC contains no factual

allegations which even nominally support these assertions.  Thus, even if Plaintiffs had properly

alleged their various § 1983 and state law claims against Cerf in his individual capacity, they

have failed to include any factual allegations, whatsoever, which would plausibly entitle them to

relief against Cerf.  See Twombly, 550 U.S. at 555; Santiago, 629 F.3d at 131 (quoting Iqbal,

556 U.S. at 680).

Because the actual language contained in the FAC belies Plaintiffs' position that it

intended to assert nearly all the claims against Cerf in his individual capacity, and Plaintiffs have

failed to plead any facts consistent with such claims against Cerf, the remaining Counts (Counts

III-XIV, XVI, and XIX-XV) are dismissed as to Cerf in his individual capacity.

**(b) The Prosecution Defendants**

The Prosecution Defendants move to dismiss Plaintiffs' FAC in its entirety against them

on the basis of sovereign immunity and absolute prosecutorial immunity.  They also move to

dismiss Counts III, IV, XIII, XIV, and XX of the FAC because the Prosecution Defendants, in

their official capacities, are not amenable to suit under §§ 1983, 1985 or the NJCRA, and Counts

XXI, XXII, XXIV, and XXV as being barred by the TCA.  (See generally Prosecution Defs.' Br.

("Pros. Br.").)[11]  Plaintiffs admit that their claims against the Prosecutor's Office, Kirk, and

Crater, in their official capacities and acting in their traditional prosecutorial roles, would be

---

[11] Because the Court finds the Prosecution Defendants, in their official capacities, are entitled to sovereign immunity
for Counts III, IV, XIII, XIV, and XX, it need not address the Prosecution Defendants' argument that they are not
persons under §§ 1983, 1985, and the NJCRA.

barred by Eleventh Amendment sovereign immunity.  (Opp'n to Prosecution Defs.' Mot. to

Dismiss ("Opp'n to Pros.") at 19.)[12]  However, Plaintiffs argue neither sovereign immunity nor

absolute prosecutorial immunity would apply where the Prosecution Defendants were acting in

their individual capacities, (id.), and nor would sovereign or absolute prosecutorial immunity

apply where the Prosecutor Defendants were not conducting prosecutorial functions.  (Id. at 21-

27, 34-37.)  Additionally, Plaintiffs argue that the TCA does not bar their claims in Counts XXI,

XXII, XXIV, and XV.  (Id. at 37-40.)

### (i)  Sovereign Immunity

The Prosecution Defendants, acting in their official capacities, may be entitled to

sovereign immunity pursuant to the Eleventh Amendment.  "Sovereign immunity extends to

state agencies and state officers, 'as long as the state is the real party in interest.'"  Estate of

Lagano v. Bergen Cnty. Prosecutor's Office, 769 F.3d 850, 857 (3d Cir. 2014) (quoting Fitchik

v. N.J. Transit Rail Operations, 873 F.2d 655, 659 (3d Cir. 1989)).  To determine whether

sovereign immunity applies, courts consider three factors: "(1) whether the money to pay for the

judgment would come from the state; (2) the status of the agency under state law; and (3) what

degree of autonomy the agency has."  Estate of Lagano, 769 F.3d at 857 (citing Fitchik, 873 F.2d

at 659).  None of these factors alone is dispositive, and they must be weighed equally.  See

Bowers v. Nat'l Collegiate Athletic Ass'n, 475 F.3d 524, 546 (3d Cir. 2007) (citing Benn v. First

Judicial Dist. of Pa., 426 F.3d at 233, 239-40 (3d Cir. 2005)).  However, the Third Circuit has

already concluded that when county prosecutors are performing classic law enforcement and

investigative functions they are acting as arms of the state, and are entitled to immunity under the

---

[12] Plaintiffs also argue that sovereign immunity does not apply to their ADA claims against the Prosecution
Defendants.  (See Opp'n to Pros. at 27-31.)  Yet, Plaintiffs have pled no such claims against the Prosecution
Defendants.

Eleventh Amendment.  (Beightler v. Office of Essex Cnty. Prosecutor, 342 Fed. App'x 829, 832 (3d Cir. 2009) (citing Coleman v. Kaye, 87 F.3d 1391, 1499-1505 (3d Cir. 1996)); see also Wright v. State, 169 N.J. 422, 461-62, 464 (2001) (finding that, when county prosecutors and their subordinates perform law enforcement and prosecutorial functions, "they act as agents of the State," and the State must indemnify a judgment arising from their conduct).  Additionally, while training and supervision have administrative aspects, when they relate to activities which "necessarily require legal knowledge and the exercise of related discretion," those training and supervision actions will also be entitled to immunity.  See Van de Kamp v. Goldstein, 55, U.S. 335, 344-46 (2009) (discussing absolute prosecutorial immunity for prosecutors in the context of a § 1983 claim); see also In re Camden Police Cases, Civ. Nos. 11-1315, 10-4747, 2011 WL 3651318, at *7 (D.N.J. Aug. 18, 2011) (finding that the Supreme Court's discussion in Van de Kamp concerning absolute prosecutorial immunity under § 1983 is "persuasive and relevant" to analysis of Eleventh Amendment sovereign immunity under Fitchik).

As noted above,[13] sovereign immunity may equally apply to Plaintiffs' state law claims. The supplemental jurisdiction statute, 28 U.S.C. § 1367, does not authorize this Court to exercise jurisdiction over claims against non-consenting states.  Raygor v. Regents of Univ. of Minn., 534 U.S. 533, 541-42 (2002).  Thus, Plaintiffs' state law claims are also barred by sovereign immunity where the State has not expressly consented to suit.  See Hyatt, 340 Fed. App'x at 837; Mierzwa, 282 Fed. App'x at 976.

Nearly all of the allegations of specific conduct made against the Prosecution Defendants in the FAC relate to the performance of their prosecutorial functions.  (See FAC ¶ 34 ("The [Prosecutor's Office] was contacted by the police department and thereafter, J.J. was charged

---

[13] See supra note 6.

23

with a crime and a judge then ordered that K.J. be placed in the Harborfield Juvenile Detention Center"); id. ¶ 189 (alleging K.J. was held at the juvenile detention center "without probable cause and with an improper purpose and motive by [the Prosecution Defendants]"); id. ¶¶ 190-97 (alleging the Prosecution Defendants pursued charges, including maliciously adding a second charge, against K.J., despite allegedly being aware of information that should have caused them to drop the charges and allegedly failing to conduct a proper investigation of all the fact);; id. ¶¶ 306, 310 (alleging, generally, that the actions of Kirk and Crater portrayed Plaintiffs in a false light, and any disclosure of his medical information was without K.J.'s consent); id. ¶ 319 (alleging the Prosecutor's Office was negligent in its supervision of Kirk and Crater); id. ¶ 323 (alleging the Prosecution Defendants were negligent for failing to reasonably investigate K.J.'s situation and choosing instead to maliciously prosecute him); but cf. id. ¶ 201 (alleging the Prosecutor's Office negligently hired and ineffectively trained and supervised Kirk and Crater); id. ¶ 318 (alleging the Prosecutor's Office was negligent for hiring Kirk and Crater and allowing them to remain in their employment).

Based on the allegations contained in the FAC, the Court finds that the Prosecution Defendants are entitled to sovereign immunity from Plaintiffs' claims which allege there was some defect in the performance of their investigatory or prosecutorial duties, including the training or supervision of Kirk and Crater. However, to the extent Counts XIII and XXV state negligent hiring claims against the Prosecutor's Office, those claims are not barred by sovereign immunity. See Coleman, 87 F.3d at 1499 (finding that prosecutors are not acting on behalf of the state when they perform administrative functions, such as making personnel decisions).[14]

---

[14] Kirk and Crater are entitled to immunity from the entirety of Counts XIII and XXV, as Plaintiffs did not allege they were responsible for any negligent hiring.

Accordingly, the Prosecution Defendants' Motion will be granted in part on the basis of sovereign immunity, and all of Plaintiffs federal and state law claims are dismissed as to Kirk and Crater in their official capacities.  Similarly, all of Plaintiffs federal and state law claims are dismissed as to the Prosecutor's Office, with the exception of the negligent hiring claims in Counts XIII and XXV.

### (ii)   Absolute Prosecutorial Immunity

Prosecutors are entitled to absolute immunity in § 1983 actions for conduct "intimately associated with the judicial phase of the criminal process," Imbler v. Pachtman, 424 U.S. 409, 430 (1976), which includes initiating judicial proceedings, presenting evidence in support of a search warrant application, and training or supervising other prosecutors.  Van de Kamp, 555 U.S. at 343, 346.  This may also include investigative functions to the extent that they relate to securing information necessary to determine whether to initiate a criminal prosecution.  See Forsyth v. Kleindienst, 599 F.2d 1203, 1215 (3d Cir. 1979); Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993) (stating that absolute immunity does not extend to "[a] prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings," but that "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity.")

The determination of whether absolute immunity applies is a functional analysis, requiring the Court to examine the nature of the function being performed.  Yarris v. Cnty. of Del., 465 F.3d 129, 136 (3d Cir. 2006).  As such, though a suit may be brought against a prosecutor in his or her individual capacity, absolute immunity may still apply if "the official

seeking absolute immunity [shows] that such immunity is justified for the function in question."
Id.; see also Pitman v. Ottehberg, Civ. No. 10-2538, 2011 WL 6935274, at *9 (D.N.J. Dec. 30,
2011) (noting that absolute immunity may be granted to a prosecutor sued in his individual
capacity "who is functioning as an 'advocate' of the state while engaging in conduct that
allegedly constitutes a constitutional violation.") (citing Yarris, 465 F.3d at 136).

　　　　With respect to Plaintiffs' state law claims, the TCA provides that a prosecutor is "not
liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding
within the scope of his employment."  N.J. Stat. § 59:3-8.  However, unlike its federal
counterpart, prosecutorial immunity is not absolute under New Jersey law.  Pitman v. Ottehberg,
Civ. No. 10-2538, 2015 WL 179392, at *9 (D.N.J. Jan. 14, 2015) (citing Newsome v. City of
Newark, Civ. No. 13-6234, 2014 WL 4798783, at *4 (D.N.J. Sept. 25, 2014)).  The TCA limits
immunity for a public employee "if it is established that his conduct was outside the scope of his
employment or constituted a crime, actual fraud, actual malice or willful misconduct."  N.J. Stat.
§ 59:3-14(a).

　　　　It is clear, based on the allegations in the FAC, that Kirk and Crater are entitled to
absolute immunity for each of the § 1983 claims asserted against them.  As described above in
Part III.(b)(i), all of the allegations against Kirk and Crater relate to their prosecutorial duties,
i.e., the investigation of the incident with K.J. and the decision to charge him with specific
crimes in light of the available evidence.

　　　　Plaintiffs have attempted to circumvent the doctrines of absolute prosecutorial immunity
and sovereign immunity by adding new, conclusory allegations, not contained within the FAC, to
their opposition papers.  In essence, Plaintiffs are now arguing that the Prosecution Defendants
are not entitled to absolute immunity for advice they allegedly gave to police "about detaining

K.J. [and] searching his home," (Opp'n to Pros. at 25), including "advis[ing] the police that K.J. be placed in Harborfield detention center for seventeen [ ] days." (Id. at 26.)  As the Prosecution Defendants note, Plaintiffs appear to be grasping at straws.  (Pros. Defs.' Br. at 9.)

First, Plaintiffs may not amend their FAC through new arguments put forth in their opposition papers.  McMahon v. Salmond, 573 Fed. App'x 128, 135 (3d Cir. 2014).  Moreover, even if the Court accepted that the conclusory allegations contained in Plaintiffs' brief were part of the Complaint, they are just that– conclusory.  There is no factual support in the FAC for their new claims.  Instead, the FAC describes a situation that progressed from the initial detention of K.J. at Cedar Creek, to the consensual search of his home by police which led to the discovery of the alleged bomb-making materials, to the transportation of K.J. by Ottepka to some undescribed location, to the decision of the Prosecutor's Office to charge K.J. with a crime after "[t]he [Prosecutor's] Office was contact by the police department," and then to the decision of a judge that K.J. be placed in the Harborfield Juvenile Detention Center.  (See FAC ¶¶ 28-34.)  Not only are these facts devoid of any mention of the Prosecution Defendants providing advice to police, they suggest the opposite.  It appears the police searched K.J.'s home after being contacted by McGhee, (id. ¶ 29), and the Prosecutor's Office did not decide to charge K.J. until the police had already performed a search of Plaintiffs' home and contacted the Prosecutor's Office.  (See id. ¶¶ 32-34.)  Additionally, the FAC clearly states that a judge made the determination to have K.J. placed in the Harborfield Juvenile Detention Center, (id. ¶ 34), and Plaintiffs have offered no explanation for how that decision could have been made by anyone other than a judge.  In sum, the FAC does not contain any allegations in the various Counts which suggest the Prosecution Defendants provide advice to the police, and any allegations of the same in Plaintiffs' opposition brief are wholly conclusory and would fail to survive this motion to dismiss.  See Iqbal, 556 U.S.

at 678 (holding that conclusory allegations are not entitled to the assumption of truth, and a plaintiff must plead more than conclusory allegations that are merely consistent with liability in order to survive a motion to dismiss under Rule 12(b)(6)).[15]

The Court finds, however, that prosecutorial immunity does not apply to Plaintiffs' malicious prosecution claim against Kirk and Crater in their individual capacities in Count XXV. Because New Jersey law does not provide absolute prosecutorial immunity for public employees whose conduct was motivated by actual malice or willful misconduct, the Court finds Plaintiffs' malicious prosecution claim is not barred by prosecutorial immunity.  See Stolinkski v. Pennypacker, Civ. No. 07-3174, 2008 WL 5136945, at *6 (D.N.J. Dec. 4, 2008) (denying prosecutorial immunity under § 59:3-14(a) where the plaintiff's malicious prosecution claims were premised on malice or misconduct).

Nor does prosecutorial immunity apply to Plaintiffs' negligent hiring in Count XXV against the Prosecutor's Office, as hiring and firing are administrative rather than prosecutorial functions.  See Buckley, 509 U.S. at 273 (stating that absolute immunity does not extend to "[a] prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings"); Coleman,

---

[15] Plaintiffs' opposition also refers to statements made to the press as another activity for which prosecutors are not entitled to absolute prosecutorial immunity.  (See Opp'n to Pros. at 34.)  After quoting Buckley, 509 U.S. at 277-78, for this proposition, Plaintiffs state that in this case "there was significant media attention and statements were made to the press by multiple people and agencies involved.  Any statements that may have been made by the [Prosecutor's Office] or individual prosecutors would not be covered under absolute immunity."  (Opp'n to Pros. at 36-37.)  To the extent Plaintiffs are attempting to allege that the Prosecution Defendants made statements to the press, which form a basis for their liability in certain claims and which were not entitled to absolute prosecutorial immunity, that assertion is raised for the first time in Plaintiffs' opposition brief and finds no support in the FAC.  Significantly, Plaintiffs opposition only makes insinuations of such allegations.  Moreover, there is nothing in the FAC suggesting statements were made to the media by the Prosecution Defendants.  The Court thus finds this possible new allegation in Plaintiffs opposition would fail for the same reasons that Plaintiffs' allegations concerning advice given to the police prior to K.J.'s detention and charging have failed – it is conclusory and unsupported by the FAC.

87 F.3d at 1499 (finding that prosecutors are not acting on behalf of the state when they perform administrative functions, such as making personnel decisions).

Because all but one of the claims against the Kirk and Crater in their individual capacities are barred by prosecutorial immunity, the Court will dismiss all Counts, excluding the malicious prosecution claim in Count XXV, in the FAC against Kirk and Crater in their individual capacities.  With respect to the remaining negligent hiring claim in Count XXV against the Prosecutor's Office, the Court will not grant the Prosecution Defendants' Motion to Dismiss on the basis of prosecutorial immunity.

### (iii)  New Jersey Tort Claims Act

The remaining question is whether Plaintiffs' claims in Count XXV are barred by the TCA.  The Prosecution Defendants argue in their brief that Plaintiffs' various state law tort claims are barred by the TCA because that statute explicitly bars claims against public officials arising out of criminal prosecutions, and Plaintiffs failed to file a timely notice of tort claim. (Pros. Defs.' Br. at 18-21.)  Plaintiffs only address the Prosecution Defendants' TCA notice argument in response, and claim that it was tolled while K.J. was still under the age of eighteen. (Opp'n to Pros. at 37-40.)  As an initial matter, the Court has already found that the Prosecutor's Office and Kirk and Crater in their individual capacities are not entitled to absolute immunity under § 59:3-8 with respect to Plaintiffs' negligent hiring claim and malicious prosecution claim in Count XXV.[16]

Regarding Plaintiffs' alleged failure to file timely notice, the TCA provides that a notice of claim must be filed within 90 days after accrual of the cause of action.  § 59:8-8.  However, that same provision of the TCA states that "[n]othing in this section shall prohibit a minor …

---

[16] See supra at Part. III.(b)(ii).

from commencing an action under this act within the time limitations contained herein, after reaching majority or returning to mental capacity." Id.; see Hill v. Bd. of Educ. of Middletown Twp., 183 N.J. Super. 36, 39 (App. Div. 1982) (holding that under § 59:8-8, "the time within which a child must give notice is tolled until after he reaches majority.")  As noted by Plaintiffs in their opposition brief, K.J. was a minor during the period covered in the FAC, (see FAC ¶ A; Opp'n to Pros. at 38), and the Prosecution Defendants apparently do not dispute this fact. Notably, neither party has indicated when K.J. turned eighteen.  However, the Prosecution Defendants have not argued Plaintiffs failed to file their notice of tort claims within 90 days of K.J.'s eighteenth birthday, only that their notice of tort claims was untimely taken from the date the judge dismissed all of K.J.'s criminal charges.  Based on the allegations in the FAC and the arguments presented by the parties, it appears that Plaintiffs' notice of tort claims was not untimely.

Accordingly, the Court will deny the Prosecution Defendants' Motion to Dismiss as to Plaintiffs' negligent hiring claim against the Prosecutor's Office and malicious prosecution claim against Kirk and Crater in their individual capacities in Count XXV.

## IV.  LEAVE TO AMEND

"[I]f a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile."  Phillips, 515 F.3d at 245 (citing Alston v. Parker, 363 F.3d 229, 235 (3d Cir. 2004)).  Indeed, even when "a plaintiff does not seek leave to amend a deficient complaint after a defendant moves to dismiss it, the court must inform the plaintiff that he has leave to amend within a set period of time,

unless amendment would be inequitable or futile." <u>Grayson v. Mayview State Hosp.</u>, 293 F.3d 103, 108 (3d Cir. 2002).

Because the Court finds that Plaintiffs may be able to cure the pleading deficiencies identified above with respect to their attempt to assert Counts III-XIV, XVI, and XIX-XV against Cerf in his individual capacity such that amendment would not be futile, the Court will grant Plaintiffs one final opportunity to seek leave to amend their FAC within fourteen days of the date of this Opinion and accompanying Order.[17]   However, Plaintiffs will not be granted leave to amend the remaining claims that will be dismissed against the State Defendants and the Prosecution Defendants in this Opinion, as those several claims will all be dismissed pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction.

V.     CONCLUSION

For the foregoing reasons, the Defendants' Motions to Dismiss will be **GRANTED IN PART** and **DENIED IN PART**.  An appropriate order shall enter today.  Plaintiffs shall have

---

[17] If Plaintiffs files a Motion for Leave to Amend the FAC, it shall attach to the Motion a copy of the proposed Fifth Amended Complaint, as required by Loc. Civ. R. 7.1(f).

**fourteen (14) days** from the date of this Opinion and accompanying Order to file a motion

seeking leave to amend their Fourth Amended Complaint.


Dated:   4/21/2015                                    __ s/ Robert B. Kugler____
                                                     ROBERT B. KUGLER
                                                     United States District Judge