NOT FOR PUBLICATION                                      (Doc. No. 43)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

_____
                                        :
K.J. and T.J on behalf of               :
K.J., JR. et al.,                       :
                                        :
                    Plaintiffs,         :        Civil No. 14-145 (RBK/JS)
                                        :
          v.                            :        **OPINION**
                                        :
GREATER EGG HARBOR                      :
REGIONAL HIGH SCHOOL                    :
DISTRICT BOARD OF                       :
EDUCATION et al.,                       :
                                        :
                    Defendants.         :
_____       :

**KUGLER**, United States District Judge:

　　　This matter comes before the Court on the Motion of Defendants Greater Egg Harbor

Regional High School District Board of Education, Dr. Steve Ciccariello, John Ragan, Erin

Byrnes, James Reina, Michael McGhee, Scott Parker, Megan Hallman, Gregory Ferree, Maggie

Holmes, Paula Londono, Cori Koury, Karen Cavalieri Christine Reina, Erin Hoban, Stephanie

Tarr, Edward Ottepka, and Ramone Valentine, to Dismiss Plaintiffs' Fourth Amended Complaint

pursuant to Rule 12(c).  Plaintiffs assert several claims in their Fourth Amended Complaint,

including but not limited to claims under 42 U.S.C. § 1983, the New Jersey Law Against

Discrimination, the American with Disabilities Act, and the New Jersey Civil Rights Act.  For

the reasons stated herein, Defendants' Motions to Dismiss will be granted in part and denied in

part.

1

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

This matter arises out of events that took place at a New Jersey high school days after the tragic shooting at Sandy Hook Elementary School in Newtown, Connecticut on December 14, 2012.  (Fourth Amended Complaint ("FAC") ¶ 19.)[2]  Three days after Sandy Hook, one of K.J., Jr.'s ("K.J.") teachers saw a drawing in K.J.'s sketchbook that concerned her.  When school officials reviewed K.J.'s other drawings they found a drawing of what appeared to be a weapon, which prompted them to detain K.J. and call the police.  The police searched K.J.'s home and found parts that might have been used to make the weapon depicted in the drawing.  Shortly thereafter, K.J. was arrested and placed in a juvenile detention facility, where he remained for over two weeks.  Upon his release, he was placed under house arrest and forced to wear an ankle monitor until, several months later, the judge presiding over his trial dismissed one of the charges entirely and found K.J. not guilty on the remaining counts.  During and as a result of these events, K.J. was deprived of at least fourteen months of high school education, and subject to multiple other constitutional and state law violations.

### (a) The Parties

Plaintiffs are members of the Jones family, and all are residents of New Jersey.  (Id. ¶ A.)  Kevin Jones ("Kevin") and Teresa Jones ("Teresa") are the parents of K.J., and his siblings, K.J. and C.J. (the "Siblings") (collectively "Plaintiffs").  (Id.)

The Defendants in this action are many.  Beginning with the School Defendants, Greater

---

[1] On a motion to dismiss under Fed. R. Civ. P. 12(c) the Court applies the same standard as Rule 12(b)(6).  The Court must "accept all factual allegations as true and construe the complaint in the light most favorable to the Plaintiff."  Accordingly, the following facts are taken from Plaintiffs' Fourth Amended Complaint.  See Phillips v. Cnty. of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008).

[2] See generally James Barron, Nation Reels After Gunman Massacres 20 Children at School in Connecticut, N.Y. Times, Dec. 14, 2012, http://www.nytimes.com/2012/12/15/nyregion/shooting-reported-at-connecticut-elementary-school.html.

Egg Harbor Regional High School Board of Education ("Egg Harbor") is a public school district located in New Jersey.  (Id. ¶ B.)  Dr. Steve Ciccariello ("Ciccariello") is the Superintendent of Schools at Egg Harbor.  (Id. ¶ C.)  John Ragan ("Ragan") is the District Supervisor of Special Services, and is the Anti-Bullying Coordinator for Egg Harbor.  (Id. ¶ D.)  Erin Byrnes is a school psychologist and Anti-Bulling Specialist at Cedar Creek High School ("Cedar Creek"), a school in Egg Harbor.  (Id. ¶ E.)  James Reina ("Reina") is the Principal of Cedar Creek, (id. ¶ F), and Michael McGhee ("McGhee") is the Vice Principal and Supervisor of Special Education at Cedar Creek.  (Id. ¶ H.)  Scott Parker ("Parker") is or was also Vice Principal for Cedar Creek, and is the Anti-Bullying Liaison for Cedar Creek.  (Id. ¶ I.)  Christine Reina ("Christine") is the Homebound Instruction Coordinator for Cedar Creek.  (Id. ¶ G.)  Megan Hallman ("Hallman") was K.J.'s geometry teacher at Cedar Creek.  (Id. ¶ J.)  Gregory Ferree ("Ferree") is a German teacher and Homebound instructor at Cedar Creek.  (Id. ¶ K.)  Paula Londono ("Londono") is a guidance counselor employed at Cedar Creek.  (Id. ¶ M.)  Cori Koury ("Koury") was a case manager on the Child Study Team at Cedar Creek, and Maggie Holmes ("Holmes") is also a case manager on the Child Study Team at Cedar Creek.  (Id. ¶ N.)  Karen Cavalieri ("Cavalieri") is the Supervisor of the Guidance Department at Cedar Creek.  (Id. ¶ O.)  Erin Hoban ("Hoban") is an Art Teacher at Cedar Creek.  (Id. ¶ P.)  Stephanie Tarr ("Tarr") is an Event Coordinator with Egg Harbor.  (Id. ¶ Q.)  Edward Ottepka ("Ottepka") is a school resource officer at Cedar Creek, and Ramone Valentine ("Valentine") is a school security officer at Cedar Creek.  (Id. ¶ R.)  These defendants will be referred to collectively as the "School Defendants."

Plaintiff has also named several Defendants unaffiliated with Egg Harbor.  The Prosecution Defendants include the Atlantic County Prosecutor's Office (the "Prosecutor's Office"), located in Mays Landing, New Jersey (id. ¶ T), as well as Assistant Prosecutors Lauren

Kirk ("Kirk") and Anne Crater ("Crater"), each of whom work at the Prosecutor's Office (collectively the "Prosecution Defendants"). (Id. ¶¶ U-V.) The Police Defendants include the Galloway Police Department (the "Police Department"), an arm of the Township of Galloway in Galloway, New Jersey (id. ¶ V), and Detectives McGinty ("McGinty"), Doyle ("Doyle"), Higbee ("Higbee"), and Hendrickson ("Hendrickson") of the Police Department (collectively the "Police Defendants"). (Id.) Finally, the State Defendants include the New Jersey Department of Education (the "NJDOE"), and Commissioner Cerf ("Cerf"), the Commissioner of the Department of Education (collectively the "State Defendants"). (Id. ¶ Y.)[3]

### a. The Facts

Beginning in 2010, K.J. attended Cedar Creek, a magnet program for engineering. (Id. ¶ 13.) Though gifted in the areas of art, chemistry, and engineering, (id.), K.J. was also a student with disabilities who had been classified by Egg Harbor as "Other Health Impaired" for Attention Deficit Disorder. (Id. ¶ 12.) As a result, K.J. had been given an Individualized Education Program ("IEP"). (Id.) The IEP noted that K.J. doodled and drew in class, which Plaintiffs allege allowed K.J. to express himself, as well as concentrate and focus in class. (Id. ¶ 15.) To that end, K.J. carried a personal sketchpad with him at school, in which he kept his drawings and doodles. (Id. ¶ 18.)

Prior to the events at issue in this case, K.J. had only one disciplinary incident while attending Cedar Creek. (See id. ¶ 22.) On October 20, 2011, K.J. was removed from school and suspended at first for ten days, and then until the end of January 2012, due to an incident on the bus. (Id. ¶ 16.) Plaintiffs do not describe the event that took place on or around October 20,

---

[3] An earlier opinion of this Court addressed the Motions to Dismiss of the State Defendants and Prosecution Defendants. See K.J. et al v. Greater Egg Harbor Regional High School District Board of Education et al, No. 14-145 (RBK/JS), 2015 WL 1816453 (D.N.J. April 21, 2015) (denying defendants' motions in part and granting in part).

2011.  K.J. was apparently evaluated as a result of the incident by Dr. Hewitt, Egg Harbor's

psychiatrist, on October 26, 2011.  (Id. ¶ 17.)  Based on his review of K.J., Dr. Hewitt

determined K.J. was not a danger to himself or others, and that K.J. had Asperger's Syndrome.

(Id.)

On December 14, 2012, a tragic shooting occurred at Sandy Hook Elementary School in

Newtown, Connecticut.  (Id. ¶ 19.)  Three days later, on December 17, 2012, Hallman noticed a

drawing of a "spaceman" K.J. was sketching during geometry class.  (Id. ¶ 20.)  Based on

Hallman's concern about the content of K.J.'s drawings, he was called out of class by McGhee

and taken to the Vice Principal's office late the next day, December 18, 2012.  (Id. ¶ 21.)  While

K.J. was in the Vice Principal's office he was repeatedly told by McGhee that he was not in

trouble, though Valentine, the school safety officer, remained in or around McGhee's office the

entire time.  (Id. ¶ 23.)  McGhee allegedly manipulated K.J. into showing McGhee the drawings

in K.J.'s sketchpad by leading K.J. to believe that McGhee was genuinely interested in K.J.'s

artwork and designs.  (Id. ¶ 24.)  Based on McGhee's supposed interest, K.J. proudly showed

McGhee his drawings.  (Id.)

In K.J.'s sketchpad there was an updated drawing of a superhero glove with a flame

coming out of it, a concept drawing which K.J. started two years earlier based on the Ironman

movie.[4]  The drawing of the glove was done solely at K.J.'s home, not at school, and was

contained in K.J.'s personal, private sketchbook.  (Id. ¶ 26.)  K.J. never intended for anyone to

see the glove drawing.  (Id. ¶ 25.)

After reviewing the drawings in K.J.'s sketchbook, McGhee decided to keep K.J. in his

office.  (Id. ¶ 27.)  McGhee also called Teresa and informed her that K.J. was in his office, but

---

[4] See generally IRON MAN (Paramount Pictures 2008).

that K.J. was not in trouble.  (<u>Id.</u> ¶ 28.)  At no point during McGhee's conversation with Teresa was she informed that K.J. was in trouble at school.  (<u>Id.</u>)  While McGhee was speaking with Teresa on the phone he also apparently contacted the local police department and kept Teresa on the phone until the police arrived at her home.  (<u>Id.</u> ¶ 29.)  The fire department, EMS, and bomb squad also arrived at Teresa's home soon after the local police.  (<u>Id.</u>)  Plaintiffs' home was searched by the police with Kevin's consent.  (<u>Id.</u> ¶ 31.)  Plaintiffs allege this consent was given only because McGhee "deceived [Teresa] into believing that their son was not in any trouble." (<u>Id.</u>)  During their search, the police found items such as wires, thermite chemical, and switches, which were apparently part of K.J.'s science and engineering homework.  (<u>Id.</u> ¶ 32.)

Around this time, Reina also apparently issued an "All Call" to all families in the school district notifying them of what occurred.  (<u>Id.</u> ¶ 30.)  This "All Call" went out with the knowledge of Ciccariello.  (<u>Id.</u>)  Reina also allegedly had bomb-sniffing dogs go through the school at that time.  (<u>Id.</u>)  While the police were searching Plaintiffs' home, K.J. was allegedly transported somewhere by Ottepka.  (<u>Id.</u> ¶ 33.)  Though Plaintiffs do not indicate where Ottepka transported K.J., he apparently did so in a private car, without any other adult present, and without notifying K.J.'s parents.  (<u>Id.</u>)

At some point after the search of Plaintiffs' home, the Prosecutor's Office was contacted by the Police Department.  (<u>Id.</u> ¶ 34.)  K.J. was charged with a crime and a judge ordered that K.J. be placed in the Harborfield Juvenile Detention Center ("Harborfield"), where he spent seventeen days.  (<u>Id.</u>)  While at Harborfield, K.J. was strip searched and cavity searched.  (<u>Id.</u>) Upon K.J.'s release from Haborfield he was placed under house arrest.  (<u>Id.</u> ¶ 36.)  This meant K.J. was confined to his home, and had to wear an ankle bracelet from early January 2013 until May 23, 2013.  (<u>Id.</u>)

A criminal trial was held before Judge Jackson on May 21 and May 22, 2013.  (Id. ¶ 37.)
Before the trial began, Judge Jackson dismissed the second charge against K.J.  (Id.)  After
expert testimony was taken, Judge Jackson found K.J. not guilty of the remaining charges against
him because K.J. did not have the requisite malicious intent needed to substantiate the charges.
(Id. ¶ 38.)  Judge Jackson also determined, based on expert reports from the State and on behalf
of K.J., that the glove device found in K.J.'s home would not constitute a weapon, even upon
completion.  (Id.)

Plaintiffs allege that the School Defendants attempted to expel K.J. from school at some
point prior to March 2014, because he had been arrested in connection with the December 18,
2012, incident.  (Id. ¶¶ 35, 42.)  K.J. was also denied his right to return to school by the School
Defendants.  (Id. ¶ 40.)  Instead, K.J. was on home instruction while under house arrest.  (Id. ¶
41.)  It was not until March 2014, after an Administrative Law action and this action had been
filed, that Egg Harbor allowed K.J. to return to school on a limited basis.  (Id. ¶ 42.)  In total,
K.J. was prevented from returning to school from December 2012 until March 2014.  (Id.)

Additionally, during his period of house arrest, K.J.'s German tutor apparently saw
another one of K.J.'s drawings and attempted to confiscate it from Plaintiffs' home, on orders
from Reina and Parker.  (Id. ¶ 40.)  That same spring of 2013 Egg Harbor notified the venue for
a Cedar Creek class trip to Boston that K.J. was a "behavior issue," which ultimately prevented
him from attending that field trip.  (Id. ¶ 43.)  Finally, it is generally averred that Egg Harbor
harassed, intimidated, bullied, retaliated against, and cyber-bullied K.J., failed to comply with
the mandatory investigation requirements under the New Jersey Anti-Bullying Bill of Rights,
and created a hostile school environment.  (Id. ¶ 44.)

On the basis of the aforementioned facts, Plaintiffs bring twenty-five claims for relief.

They are as follows: a claim for violation of Section 504 of the Rehabilitation Act (Count I); a claim for violation of the Americans with Disabilities Act (the "ADA") and the Americans with Disabilities Amendment Act (the "ADAA") (Count II); a claim for violation of the New Jersey Civil Rights Act (the "NJCRA") (Count III); a 42 U.S.C. § 1983 claim for violating K.J.'s Fourth Amendment rights (Count V);[5] a § 1983 claim for violating K.J.'s First Amendment rights (Count VI); a § 1983 claim for violating K.J.'s Procedural Due Process rights under the Fourteenth Amendment (Count VII); a § 1983 claim for violating the Equal Protection clause of the Fourteenth Amendment (Count VIII); a § 1983 claim for maintaining a custom or practice, and showing deliberate indifference to K.J.'s rights under the Constitution (Count IX); a § 1983 claim for deliberate indifference to K.J.'s rights under the Constitution (Count X); a § 1983 claim for failure to properly hire, train, and supervise, violating K.J.'s rights under the Constitution (Count XI); a § 1983 and 42 U.S.C. § 1981 claim for false arrest and false imprisonment (Count XII); a § 1983 claim for malicious and unconstitutional prosecution (Count XIII); a 42 U.S.C. § 1985 claim for conspiracy (Count XIV); a claim for violation of the New Jersey Anti-Bullying Bill of Rights Statute (the "NJ ABBRS") and Egg Harbor's Anti-Harassment, Intimidation, Bullying, and Retaliation Policy (Count XV); a claim for violating the New Jersey Law Against Discrimination (the "NJLAD") based on K.J.'s disability (Count XVI); a claim for violating the NJLAD by creating a hostile learning environment (Count XVII); a claim for violating the NJLAD by aiding and abetting the discriminatory actions of others (Count XVIII); a claim for violating the NJLAD via retaliation (Count XIX); a claim for vicarious liability (Count XX); a claim for intentional infliction of emotional distress ("IIED") (Count XXI); a claim for negligent infliction of emotional distress ("NIED") (Count XXII); a claim for

---

[5] Though Plaintiffs included a Count IV, it only alleges that all Defendants are "persons" for purposes of the subsequent § 1983 claims, and contains no substantive allegations of misconduct on behalf of any defendant.

defamation, libel, and slander (Count XXIII); a claim for violating Plaintiffs' right to be free

from false light and invasion of privacy under the Fourteenth Amendment and the common law

(Count XXIV); a claim for negligence, gross negligence, and respondeat superior under the New

Jersey Tort Claims Act (the "TCA") (Count XXV); and a claim for injunctive and declaratory

relief to enforce K.J.'s Due Process rights under the Individuals with Disabilities Act (the

"IDEA") (Count XXVI).  (See generally FAC.)

### (b) Procedural History

Sometime in late 2013 or early 2014, Plaintiffs filed a "Due Process action" and Request

for Emergent Relief in the Administrative Law Forum[6] in New Jersey to address some of

Plaintiffs' issues concerning his educational rights.  (See id. ¶ 6.)  The Request for Emergent

Relief was withdrawn when the parties reached a temporary limited settlement agreement

encompassing the period until the end of the school year in 2014.  (Id. ¶ 7.)  There was a Due

Process hearing date scheduled for June 23, 2014, but the administrative trial was still

unscheduled at the time the FAC was filed.  (Id.)  On August 21, 2013, Plaintiffs filed a Notice

of Tort Claims, and on February 28, 2014, Plaintiffs filed an Amended Notice of Tort Claims.

(Id. ¶ 11.)

The present action was commenced on January 9, 2014, when Plaintiffs filed their

original Complaint.  (Doc. No. 1)  The original Complaint was amended four times, including on

January 21, 2014, (Amended Complaint (Doc. No. 5)), February 5, 2014, (Second Amended

Complaint (Doc. No. 7)), April 15, 2014, (Third Amended Complaint (Doc. No. 17)), and

October 14, 2014.  (FAC (Doc. No. 32).)  The FAC was filed pursuant to the June 20, 2014,

Order of this Court, in which Plaintiffs' Motion to Amend the Third Amended Complaint was

---

[6] In their Complaint, Plaintiffs refer to the New Jersey Office of Administrative Law as the Administrative Law Forum.

granted and the Motions to Dismiss the Third Amended Complaint, filed by certain School

Defendants and the Prosecution Defendants, were dismissed as moot.  (Doc. No. 32.)

Shortly after the FAC was filed, the School Defendants filed a Motion to Dismiss the

FAC.  (Doc. No. 43.)  Because the pending motions have been briefed by the parties, the Court

proceeds to its discussion of merits.

## II.   LEGAL STANDARD

The standard for a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(c) is

the same as that for a motion to dismiss pursuant to Rule 12(b)(6).  Rule 12(b)(6) allows a court

to dismiss an action for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P.

12(b)(6).  When evaluating a motion to dismiss, "courts accept all factual allegations as true,

construe the complaint in the light most favorable to the plaintiff, and determine whether, under

any reasonable reading of the complaint, the plaintiff may be entitled to relief."  Fowler v.

UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (quoting Phillips v. Cnty of Allegheny, 515

F.3d 224, 233 (3d. Cir. 2008)).  In other words, a complaint is sufficient if it contains enough

factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  Ashcroft

v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).

It is not for courts to decide at this point whether the moving party will succeed on the merits,

but "whether they should be afforded an opportunity to offer evidence in support of their

claims."  In re Rockefeller Ctr. Prop., Inc., 311 F.3d 198, 215 (3d Cir. 2002).  Yet, while

"detailed factual allegations" are not necessary, a "plaintiff's obligation to provide the 'grounds'

of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic

recitation of the elements of a cause of action will not do."  Twombly, 550 U.S. at 555 (citations

omitted) (alteration in original).

10

To make this determination, a court conducts a three-part analysis.  Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010).  First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim."  Id. (quoting Iqbal, 556 U.S. at 675).  Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth."  Id. at 131 (quoting Iqbal, 556 U.S. at 680).  Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."  Id. (quoting Iqbal, 556 U.S. at 680).  This plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Iqbal, 556 U.S. at 679.  A complaint cannot survive where a court can infer only that a claim is merely possible rather than plausible.  Id.

## III.    DISCUSSION

At the outset, the Court notes that much of Plaintiffs' 103-page Complaint relies on the vague practice of group pleading, wherein Plaintiffs allege that all School Defendants engaged in certain wrongful conduct.  See Falat v. Cnty. of Hunterdon, No. 12-6804 (SRC), 2013 WL 1163751, *3 (D.N.J. Mar. 19, 2013) (condemning plaintiff's group pleading as "impermissibly vague").  Specifically, Plaintiffs frequently attribute wrongful actions to "said individual defendants named in paragraph 75, in their individual and official capacities."  (See, e.g., FAC ¶¶ 87, 94, 114.)  Paragraph 75, however, names seventeen individual School Defendants, in addition to Egg Harbor, making it next to impossible for the Court to decipher whose actions are serving as the basis of the alleged cause of action.

Where Plaintiffs have included specific factual allegations, see FAC ¶¶ 12–45 ("Facts Common to All Counts"), it is still unclear as to which counts these allegations relate.  Each of

the Complaint's twenty-six Counts begins with incorporating "each and every allegation set forth above as if such allegations are set forth at length therein." (E.g., ¶¶ 46, 54, 61, 73, 82, 87). Although pleading by incorporation is a common practice, the Counts themselves largely require the court to guess which factual assertions in the 103-page Complaint support Plaintiffs' individual claims. See Falat, 2013 WL 1163751, at *3 (refusing "to guess which factual assertions in the 57–page Complaint are intended to support which legal claims").

Defendants argue that Plaintiffs' failure to identify which claims apply to which defendants is cause for dismissal. (See Defs.' Br. 6–7.) In their Reply Brief, Plaintiffs fail to remedy the ambiguity and instead defend its pleading practice, reiterating that "Plaintiffs specifically state in paragraph 75 each and every name of all of the school defendants that each count is applicable to." (Pl.'s Br. 26.) Plaintiffs miss the point. Referring to a numbered paragraph naming all eighteen School Defendants does not adequately allege which specific defendants, nor which of their actions, are responsible for the violations alleged. "It is not the Court's job to laboriously search the Complaint for factual assertions that could, in theory, be used to support one legal claim or another. 'District judges are not archeologists. They need not excavate masses of papers in search of revealing tidbits. . . .'" Id. at *3 (quoting Northwestern Nat'l Ins. Co. v. Baltes, 15 F.3d 660, 662 (7th Cir. 1994).

Accordingly, the Court dismisses Counts III (New Jersey Civil Rights Act), VII (Procedural Due Process), VIII (Equal Protection), XVI (NJLAD), XVII (NJLAD – Hostile Learning Environment), XVIII (NJLAD – Aiding and Abetting), XIX (NJLAD-Retaliation), Count XX (Vicarious Liability), XXI (Intentional Infliction of Emotional Distress), Count XXII (Negligent Infliction of Emotional Distress), and Count XXV (Negligence, Gross Negligence, and Respondeat Superior). In addition, because Count IV merely alleges that all named School

12

Defendants are "persons" under § 1983 but fails to allege any substantive violation, see FAC ¶¶73–81, it, too, is dismissed.

    **(a) Remaining Claims**

        **(i)   Count I–II (Section 504 of the Rehabilitation Act and the ADA)**[7]

    Plaintiffs' allege violations of the Rehabilitation Act and the ADA on K.J.'s behalf.[8]  To state a claim for a violation of Section 504 of the Rehabilitation Act, a plaintiff must show that (1) he is a "handicapped individual," (2) he is "otherwise qualified" for participation in the program, (3) the program receives "financial federal assistance," and (4) he was "denied the benefits of" or "subject to discrimination" under the program.  29 U.S.C. § 794(a); see also Nathanson v. Med. Coll. of Pa., 926 F.2d 1368, 1380 (3d Cir. 1991).  Similarly, a plaintiff may maintain a claim for a violation of the ADA by showing the same elements, minus the requirement that the program receive financial federal assistance, but with the requirement that the program be provided by a "public entity."  See 42 U.S.C. § 12132 ("Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."); see also Helen L. V. DiDario, 46 F.3d 325, 332 (3d Cir. 1995) (noting that the ADA "extend[ed] section 504's anti-discrimination principles to public entities.").  Plaintiffs may request both injunctive relief for violations of Section 504 and the ADA, as well as compensatory damages and other relief "available in a private cause of action under Title VI of the Civil Rights Act of 1964."  A.W. v.

---

[7] "Section 504 and ADA claims are subject to the same analysis and thus may be addressed at the same time."  See Patrick B. ex rel. Keshia B. v. Paradise Protectory and Agr. Sch., Inc., No. 1:11–CV–00927, 2012 WL 3233036, *4 (M.D. Pa. Aug. 6, 2012).

[8] Defendants move to dismiss Plaintiffs' derivative claims, arguing that such claims are impermissible under the IDEA, Section 504, and § 1983.  (Defs.' Br. 22).  However, Plaintiffs concede in their Reply Brief that their derivate claims relate only to those counts sounding in tort law.  (See Pl.'s Br. 47–48.)  Therefore, the Court considers the Section 504 and ADA claims only as they pertain to K.J.

Jersey City Pub. Sch., 486 F.3d 791, 804 (3d Cir. 2007).

Plaintiffs allege violations of Section 504 and the ADA by Egg Harbor, a public school district in receipt of financial federal assistance.[9]  (FAC ¶ 50, 59.)  They allege K.J. is disabled within the meaning of both Section 504 and the ADA because he has been diagnosed with Asperger's Syndrome and Attention Deficit Hyperactivity Disorder, and due to his disabilities he is substantially limited in the major life activities of learning and social interaction.  (Id.¶ 49; see also id. ¶¶ 54, 57 (incorporating into ADA claim the elements pled in Plaintiffs' Section 504 claim).)  They contend that K.J. was "otherwise qualified to participate in school activities," including "[Egg Harbor's] educational program." (Id. ¶49; see also id. ¶ 58.)  Plaintiffs also allege that, on account of his disabilities, K.J. "was considered a safety risk without consideration at all for addressing the perception held by the school district" and excluded from school and school related activities.  (Id. ¶ 51; id. ¶ 58 (incorporating ¶ 51 into Count two).)

Defendants request that the Court dismiss Plaintiffs' Section 504 (Counts I) and ADA (Count II) claims because they are merely repackaged IDEA claims, which were rendered moot by the parties' administrative settlement.  (See Defs.' Br. 3.)  Defendants also argue that, because these claims resound under the IDEA, they are subject to the IDEA's administrative exhaustion requirement.  (Defs.' Reply Br. at 2–4.)

The Court disagrees with Defendants and finds Plaintiffs' claims under Section 504 and the ADA are not moot.  The IDEA settlement resolved only educational compensation for

---

[9] Plaintiffs' Complaint alleges violations of Section 504 and the ADA only by Egg Harbor.  It does not allege that any other School Defendant violated Section 504 or the ADA.  (See FAC ¶¶50–51, 58.)  In their Brief, however, Plaintiffs appear to argue that the individual School Defendants violated these provisions as well.  (See Pl.'s Br. 26.)  Because Plaintiffs did not assert such allegations in their Complaint, the Court will only note that Section 504 and the ADA do not create individual liability for public employees.  (See A.W. v. Jersey City Pub. Sch., 486 F.3d 791, 804 (3d Cir. 2007) ("Suits may be brought pursuant to Section 504 against recipients of federal financial assistance, but not against individuals." (citing Emerson v. Thiel Coll., 296 F.3d 184, 190 (3d Cir. 2002))); Calloway v. Boro of Glassboro Dep't of Police, 89 F. Supp. 2d 543, 557 (D.N.J. 2000) (citing cases from other districts and circuits for the proposition that "individual defendants cannot be held liable for violations of Title II of the Disability Act").

Plaintiff's IDEA claims.  Here, Plaintiff is seeking relief in the form of compensatory damages for alleged discrimination under the ADA and Section 504, FAC ¶¶ 53, 60, a form of relief appropriate for both the alleged violations. [10]  A.W., 486 F.3d at 804.  Thus, the relief Plaintiffs seek in Counts I and II differs from that received in the administrative settlement.  As such, the Court declines to dismiss Counts I and II against Egg Harbor on the basis of mootness.

For the same reason, the Court finds that the Plaintiffs have not bypassed the IDEA's exhaustion requirement.  Exhaustion of administrative remedies is required "[w]here a plaintiff brings an action under Section 504 or the ADA seeking relief that is also available under the IDEA."  Derrick v. Red Lion Area Sch. Dist., 586 F. Supp. 2d 282, 295 (M.D. Pa. 2008).  Here, however, Plaintiffs seek compensatory damages for the alleged discrimination under Section 504 and ADA, a remedy unavailable under the IDEA.  See Chambers ex rel Chambers v. Sch. Dist. Of Phil. Bd. of Educ., 587 F.3d 176, 186 (3d Cir. 2009) ("Given the Supreme Court's pronouncement in [Sch. Comm. of the Town of Burlington v. Dept. of Educ. of Mass., 471 U.S. 359 (1985)] as well as the plain language of and structure of the IDEA, we agree with our sister circuits, and now hold, that compensatory and punitive damages are not an available remedy under the IDEA."); Patrick B. ex rel Keshia B. v. Paradise Protectory and Agr. Sch., Inc., No. 1:11-CV-00927, 2012 WL 3233036, *4 (M.D. Pa. Aug. 6, 2012) ("A key difference between Section 504, the ADA and the IDEA is that compensatory damages, while not available under the IDEA, are available under Section 504 and the ADA."); J.L. v. Ambridge Area Sch. Dist., 622 F. Supp. 3d 257, 274 (W.D. Pa. 2008) (declining to dismiss plaintiff's Section 504 and ADA

---

[10] Plaintiffs assert in their brief that they are also seeking punitive damages, but such a prayer for relief is not included in their Complaint.  (See FAC ¶ 53 (asserting that Defendants' violations entitle K.J. to compensatory damages); id. ¶ 60 (same)).)  The Court will simply note that punitive damages are not an available remedy for Section 504 or ADA violations.  See Williams v. Hayman, 657 F. Supp. 2d. 488, 503 ("[P]unitive damages are not available under Title II of the ADA as a matter of law); A.W., 486 F.3d at 804 (providing that punitive damages are unavailable for Section 504 violations).

claims for failure to exhaust because plaintiff sought monetary damages and attorney's fees for the denial of plaintiff's educational rights, and such relief was not available in the underlying administrative forum).

Accordingly, the Court finds that Plaintiffs have set forth sufficient facts to plausibly conclude that they are entitled to relief for Egg Harbor's alleged violations of Section 504 and the ADA. Defendants' Motion to Dismiss Counts I and II is denied.

### (ii) Section 1983 Claims

Plaintiffs bring suit under 42 U.S.C. § 1983 against Egg Harbor as well as all individual School Defendants, in both their individual and official capacities, for a number of constitutional violations, including but not limited to violations of K.J.'s rights under the First, Fourth, and Fourteenth Amendments of the U.S. Constitution.

As an initial matter, the Court will address Defendants' request to summarily dismiss all of Plaintiffs' § 1983 claims (Counts IV through IX). Defendants contend that Counts IV through XI are merely "repackaged" claims stemming from IDEA violations and should therefore be dismissed because "Congress did not intend § 1983 to be available to remedy violations of the IDEA." (Defs.' Reply Br. 6 (quoting A.W., 486 F.3d at 806).)

Although the Court agrees with Defendants' general statement of the law, it disagrees with Defendants' application thereof. Section 1983 does not remedy violations of rights created by the IDEA itself, but § 1983 is available to remedy constitutional violations such as those alleged here. See MG ex rel. LG v. Caldwell-West Caldwell Bd. of Educ., 804 F. Supp. 2d 305, 316 (3d Cir. 2011) ("[A] § 1983 action is not available to remedy violations of IDEA-created rights." (quoting A.W., 486 F.3d at 802)). Accordingly, the Court declines to summarily dismiss all of Plaintiffs' § 1983 claims and will review the remaining claims in turn.

**1.   Section 1983 Claims against Egg Harbor (Counts V, VI, IX)**

Plaintiffs allege that Egg Harbor is liable under § 1983 for the violation of K.J.'s

constitutional rights.  Specifically, in Count IX, Plaintiffs allege that Egg Harbor is liable

because its policies caused the violations of K.J.'s constitutional rights.  (See FAC ¶ 139–53

(alleging violations of K.J.'s "Federally protected rights to return to school," "Federally

protected rights to due process," and "equal protection rights").)  Defendants' argue for dismissal

of Plaintiffs' § 1983 claims against Egg Harbor because Plaintiffs have failed to adequately

allege that an Egg Harbor policy or custom caused the alleged constitutional violations.  (Defs.'

Br. 8–9; Defs.' Reply Br. 8–9.)

A plaintiff may not hold a municipal entity such as a school district liable under 42

U.S.C. § 1983 for the constitutional violations of its employees.  See Monell v. Dep't of Soc.

Servs. of New York, 436 U.S. 658, 691 (1978); Moeck v. Pleasant Valley Sch. Dist., 983 F.

Supp. 2d 516, 523 (M.D. Pa. 2013).  Instead, municipal liability "must be founded upon evidence

that the government unit itself supported a violation of constitutional rights."  Watson v.

Abington Twp., 478 F.3d 144, 155 (3d Cir. 2007) (citing Monell, 436 U.S. 658, 691–95 (1978)).

Thus, liability is appropriate when a plaintiff demonstrates a particular policy or custom,

"whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent

official policy," and that such policy or custom has been "the moving force" behind the

deprivation of an individual's constitutional rights.  Id. at 694.

Municipal policy generally involves a "statement, ordinance, regulation, or decision

officially adopted and promulgated by [a local governing] body's officers."  Simmons v. City of

Phila., 947 F.2d 1042, 1059 (3d Cir.1991) (citing Monell, 436 U.S. at 690).  A municipal custom,

on the other hand, refers to those official practices which, despite lacking the formal approval of

a policy, are "so permanent and well settled ... as to [have] the force of law."  Id. at 1059 (citing

Monell, 436 U.S. at 691).

Drawing all inferences in favor of Plaintiffs, as the Court is obliged to do at this stage, the

Court nonetheless finds that Plaintiffs have insufficiently alleged liability of Egg Harbor.

Plaintiffs have identified two purported Egg Harbor policies.  First, Plaintiff alleges that the

individual school defendants were enforcing a "written policy set forth in the 2012 Cedar Creek

High School Parent Handbook . . . which applied to all schools throughout the school district."

(Id. ¶ 146.)  Plaintiffs assert that because the policy omits the word "disability," it "enables equal

education for students, other than those with disabilities."  (Id. ¶ 147–148.)  However, there are a

myriad of reasons why the word disability was omitted, including the reasonable explanation that

the policy ensures an equal education for all students with or without disabilities.  Inferring a

district-wide policy of discrimination against students with disabilities is not plausibly concluded

from the omission of the word "disability."  See Santiago v. Warminster Tp., 629 F.3d 121, 128

("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw a reasonable inference that the defendant is liable for the misconduct alleged."); see also

Iqbal, 556 U.S. at 679 (providing that a complaint cannot survive where a court can infer only

that a claim is merely possible rather than plausible).

As to the second policy, Plaintiffs allege that Egg Harbor had a "written district wide

policy contained in [its] parent handbook" that "ensure[d] due process" by requiring the

Superintendent or Board of Education to review a student's file in a disciplinary matter.  (FAC ¶

150).  However, Plaintiff also concedes that Defendants "deviated from its known policy and

procedure" and did not apply its procedures in K.J.'s case.  (Id.; Pl.'s Br. 28-29.)  Alleging a

single deviation from policy does not give rise to municipal liability under the <u>Monell</u> standard.
<u>See</u> <u>Monell</u>, 436 U.S. at 691 ("[T]he language of § 1983, read against the background of the
same legislative history, compels the conclusion that Congress did not intend municipalities to be
held liable unless action pursuant to official municipal policy of some nature caused a
constitutional tort."); <u>see also</u> Gretzula v. Camden Cnty. Tech. Schs. Bd of Educ., 965 F. Supp.
2d 478, 479 (D.N.J. 2013) (rejecting plaintiff's argument that school board was liable for failing
to adhere to its anti-discrimination laws and regulations without "allegations indicating that there
was an obvious pattern of misconduct relating to compliance with its procedures").

Accordingly, the Court dismisses Counts V, VI, and IX to the extent they allege liability
of Egg Harbor.

### 2. Section 1983 Claims Against Individual School Defendants in Their Official Capacities

Plaintiffs bring a number of § 1983 claims against the individual School Defendants in
both their individual and official capacities.  (Pl.'s Br. 79–80).  However, a suit against a
municipal official in her official capacity is treated as a suit against the municipality itself.  <u>See</u>
<u>Morrison v. Phillips</u>, No. 06–812 (JBS), 2008 WL 4309215, *6 (D.N.J. Sept. 16, 2008)
("Plaintiff's claims against each individual Defendant in his or her official capacity 'is the same
as a suit against the entity of which the officer is an agent.' " (quoting <u>McMillian v. Monroe</u>
<u>Cnty., Ala.</u>, 520 U.S. 781, 785 n.2 (1997))); <u>Pribula v. Wyo. Area Sch. Dist.</u>, No. 3:06-CV-2039,
2007 WL 2065830, *5 (M.D. Pa. July 16, 2007) ("Suits against municipal employees acting in
their official capacities are treated as claims against the municipal entities that employ these
individuals.").  The Court will therefore dismiss all remaining § 1983 claims against the
individual defendants in their official capacities as being duplicative of Plaintiffs' claims asserted
against Egg Harbor.  This leaves remaining the § 1983 claims against the individual School

Defendants in their individual capacities.

### 3.  Count V (Fourth Amendment)

Count V of Plaintiff's Complaint alleges that all individual school defendants violated K.J.'s Fourth Amendment rights.  Specifically, Plaintiff alleges that McGhee's search of K.J.'s sketchpad and detainment of K.J. constituted an unreasonable search and seizure, in violation of K.J.'s Fourth Amendment rights.  Plaintiffs assert that Ottepka (the School Resource Officer) and Valentine (the School Safety Officer) assisted McGhee in searching K.J.'s notebook and holding K.J. in McGhee's office.  (FAC ¶¶ 83, 86.)  Defendants challenge the sufficiency of the Plaintiff's Complaint to set forth a legally cognizable claim under the Fourth Amendment. Because Count V contains factual allegations only with respect to McGhee, Ottepka, and Valentine, see (FAC ¶¶ 93–84), the Court dismisses Count V as to all remaining individual School Defendants.[11]

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. Amend IV. The Fourteenth Amendment extends this constitutional guarantee to searches and seizures by state officers.  New Jersey v. T.L.O., 469 U.S. 325, 335 (citing Elkins v. United States, 364 U.S. 206, 213 (1960)).  As state officers, public school officials, too, are subject to the Fourth Amendment's prohibition on unreasonable searches and seizures.  Id. at 740.

However, "[t]he school setting requires some easing of the restrictions to which searches by public authorities are ordinarily subject."  T.L.O., 469 U.S. at 340.  Because school officials

---

[11]Count V alleges facts with respect to Hallman, (FAC ¶84), but it is not clear from the face of the Complaint if Plaintiffs are asserting a Fourth Amendment claim against her.  If Plaintiffs are asserting such a claim, the claim as pled must fail.  Count V alleges that Hallman "noticed a drawing of a spaceman that K.J. was sketching during class" and "became concerned."  (FAC ¶¶ 20-21).  Even when taken as true, these limited facts do not allege that Hallman violated K.J.'s Fourth Amendment rights.  Indeed, Plaintiffs do not allege that Hallman engaged in a search or seizure of K.J. at all.

must effectively balance a student's privacy interest against the "school's equally legitimate need to maintain an environment in which learning can take place," the Fourth Amendment standard stops short of probable cause.  Id.  The search must instead be reasonable under the circumstances, meaning it must be "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place."  Id. at 743 (internal quotation marks and citations omitted).  A search is justified so long as there is "a moderate chance of finding evidence of wrongdoing."  Safford Unified Sch. Dist. No. 1 v. Redding, 557 U.S. 364, 371 (2009).  Similarly, a seizure of a student in public school is also governed by the reasonableness standard.  See Shuman ex rel. Shertzer v. Penn Manor Sch. Dist., 422 F.3d 141, 148 (3d Cir. 2005) (joining other U.S. Courts of Appeals in adopting the reasonableness standard).

At this juncture, the Court accepts all factual allegations as true and views them in the light most favorable to the non-moving party.  Fowler, 578 F.3d at 210.  The court considers only whether any reasonable reading of the complaint could entitle the plaintiffs to relief.  Id. Using this standard as its lens, the Court finds that Count V does not allege a plausible Fourth Amendment claim against McGhee, Ottepka, or Valentine under the reasoning of T.L.O. Plaintiff alleges that McGhee and the officers "carr[ied] out a search of K.J.'s private personal sketchpad without any reasonable basis for such a search," "manipulate[ed] K.J. [in]to . . . show[ing] them his sketchpad" and "caused K.J. to be seized and held against his will by Mr. McGhee."  (FAC ¶¶ 83, 86–87.)  After viewing K.J.'s notebook and becoming further concerned, McGhee called the police and K.J.'s mother.  However, Plaintiff also asserts that McGhee looked at K.J.'s notebook only after Hallman reported her concern about K.J.'s drawings.  That K.J.'s teacher had such an individualized suspicion or concern contradicts

Plaintiffs' conclusory allegation that the search was not based on any reasonable basis.  See Safford, 557 U.S. at 371 (determining the reasonableness of a search by looking to "which known facts imply prohibited conduct, the specificity of the information received, and the reliability of its source").

Plaintiff also has not pleaded facts alleging that the initial search was unreasonable in scope or unrelated to the objective of the search.  Upon receiving Hallman's concern, McGhee asked K.J. if he could see his drawings, and K.J. proudly showed him.  Plaintiffs do not suggest that McGhee searched any of K.J.'s belongings other than his sketchpad, the object of Hallman's concern.  The encounter took place in the privacy of McGhee's office with K.J. present, thereby limiting the intrusion.  As such, the Court finds that Plaintiffs have insufficiently alleged that McGhee, Ottepka, and Valentine conducted an unreasonable search in violation of K.J.'s Fourth Amendment rights.

Lastly, Count V has alleged little to no facts upon which the Court could find that detaining K.J. in McGhee's office was unreasonable.  In fact, the only mention of K.J.'s detainment in Count V states as follows:

> 86. Said individual defendants named in paragraph 75, in their individual and official capacities, acted under color of law, caused K.J. to be seized and held against his will by Mr. McGhee and a resource officer in Mr. McGhee's office, and the School Safety Officer, in violation of his rights under the Fourth Amendment.

(FAC ¶ 86.)  The Court has no indication of how long K.J. was kept in McGhee's office prior to K.J.'s mother or the police being called.  Plaintiffs have not alleged sufficient facts to demonstrate that questioning K.J. in McGhee's office was so unreasonable as to give rise to a Fourth Amendment claim.

Count V is therefore dismissed.

### 4.   Count VI (First Amendment)

Plaintiffs allege that all School Defendants violated K.J.'s First Amendment rights, but Count VI provides factual assertions only as to Reina, McGhee, Hallman, and Ciccariello. Therefore, the Court considers Plaintiffs' First Amendment claim only as it pertains to these individual School Defendants and dismisses Plaintiff's First Amendment Claim as to all others.

"The First Amendment unquestionably protects the free speech rights of students in public school." J.S. ex rel. Snyder v. Blue Mountain Sch. Dist., 650 F.3d 915, 926 (3d Cir. 2011).  However, students' constitutional rights "are not automatically coextensive with the rights of adults in other settings" because the First Amendment must be applied with regard to the unique circumstances present in the school environment.  Id. (quoting Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 506, 506 (1969)).  Thus, the Supreme Court has held that the speech of public school students may not be abridged unless the speech will "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school."  Tinker, 393 U.S. at 509.  A "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint" is insufficient.  J.S. ex rel. Snyder, 650 F.3d at 926 (quoting Tinker, 393 U.S. at 509).  Lastly, "Tinker requires a specific and significant fear of disruption, not just some remote apprehension of disturbance."  Id. (internal quotation marks omitted).

At this stage in the pleadings, and with the particular facts alleged, the Court cannot determine whether school officials were reasonable in determining that K.J.'s drawings were likely to materially and substantially interfere with school operations such that suspension was necessary.  Taking Plaintiffs' facts as true, K.J. did not distribute his drawing among the class, and indeed shared it with McGhee only upon his expressed interest and assurance that K.J. was

23

not in any trouble; K.J.'s disability and inclination to draw and doodle were known to his teacher and school administrators; and the school district's psychologist had previously determined that K.J. was not a danger to himself or others.  Based on these facts, the Court cannot say as a matter of law that it was reasonable for school officials to foresee a material disruption to school operations or, by extension, that K.J.'s punishment was reasonable.  For these reasons, the Court declines to dismiss Plaintiffs First Amendment claim with respect to Reina, McGhee, and Ciccariello.

However, even when taking Plaintiff's factual assertions as true, Plaintiffs have not pleaded facts sufficient to allege a plausible First Amendment claim against Hallman.  Plaintiff alleges only that Hallman expressed her concern about K.J.'s drawings.  They do not allege that Hallman is responsible for the decision to punish or suspend K.J. on account of his drawings.  Plaintiffs' First Amendment claim against Hallman is therefore dismissed.

### (iii)   Count XIV (Conspiracy)

Plaintiffs allege that all individual School Defendants were together part of a conspiracy to deprive K.J. of his constitutional rights.[12]  (FAC ¶ 204.)  Accordingly, to survive a motion to dismiss, plaintiffs must assert "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States."  Farber v. City of Paterson, 440 F.3d 131, 134 (3d Cir.2005) (citing United Bhd. Of Carpenters & Joiners v. Scott, 463 U.S. 825, 828–29 (1983)).  Moreover, "allegations of a conspiracy must provide some factual basis to support the existence of the

---

[12] Because Plaintiffs do not specify, the Court assumes that Plaintiffs allege a violation 42 U.S.C. § 1985(3), titled "Depriving persons of rights of privileges."

elements of a conspiracy:  agreement and concerted action."  Capogrosso v. The Supreme Court of New Jersey, 588 F.3d 180, 185 (3d Cir. 2009) (citing Crabtree v. Muchmore, 904 F.2d 1475, 1481 (10th Cir.1990)).

Plaintiffs have offered no facts to support their conclusory allegation that Defendants were part of a conspiracy to deprive K.J. of his rights.  Indeed, plaintiffs make no mention of an agreement or concerted action among the defendants.  As such, the Court dismisses Count XIV of the Complaint.

### (iv)   Count XV (New Jersey Anti-Bullying Bill of Rights Act)

Count XV of Plaintiffs' Complaint alleges that all School Defendants violated New Jersey's Anti-Bullying Bill of Rights Act.  N.J. Stat. Ann. § 18A:37–13 et seq.  Despite the Act's specific language stating that it "does not create or alter any tort liability," see id. § 18A:37–37, Plaintiffs contend that a violation of the statute "would be negligent or gross negligent conduct." (Pl.'s Br. 42).  The Court disagrees.  The Act plainly states that it creates no tort liability, and at least one court in this district has previously recognized as much.  See Thomas v. East Orange Bd. of Educ., 998 F. Supp. 2d 338, 345 (D.N.J. 2014) (finding that violations of the Act could not give rise to tort liability, namely negligent infliction of emotional distress).  Accordingly, Count XV is dismissed as to all Defendants.

### (v)   Count XXIII (Defamation)

Plaintiffs bring a defamation claim, alleging that School Defendants made numerous false statements that, among other things, "were injurious to K.J.'s reputation and subjected him to investigation, hatred, contempt, [and] ridicule."  (See FAC ¶ 284.)  Defendants contend that Plaintiffs' defamation claim should be dismissed because Plaintiffs have failed to allege that any of the statements made by the defendants were false.  (Defs.' Br. 21.)

25

Under New Jersey defamation law, "the plaintiff bears the burden of establishing, in addition to damages, that the defendant '(1) made a defamatory statement of fact (2) concerning the plaintiff (3) which was false, and (4) which was communicated to a person or persons other than the plaintiff.' " Petersen v. Meggitt, 969 A.2d 500, 507 (N.J. Super. Ct. App. Div. 2009) (quoting Feggans v. Billington, 677 A.2d 771, 775 (App. Div. 1996)).  The plaintiff also bears the burden of proving fault—either negligence or malice—depending on whether the matter is one of private or public concern.  Id.

Taking these elements into account, Plaintiffs claims for defamation fail for a number of reasons.  First, Plaintiffs often fail to identify even the general content of the statements it alleges are defamatory.  (See, e.g., FAC ¶ 284 ("Statements made by Mr. McGhee, Mr. Reina, and Stephanie Tarr to the police and/or to the Smithsonian . . . were false and injurious to K.J.'s reputation . . . .").)  Second, when Plaintiffs do identify the alleged defamatory statements, they nevertheless fail to provide a factual basis for the allegation that the statement was false.  For example, Plaintiffs assert that McGhee "allegedly contacted the police department in December 2012, and informed them about the drawing he had discovered as a result of his inappropriate and unfounded search of K.J.'s personal sketchpad." (FAC ¶ 287.)  However, Plaintiffs allege no facts suggesting that McGhee's statements to police were false.  (See id. (alleging only that "said statements to police were false and defamatory in nature").).  Finally, other assertions made by Plaintiffs fail to specify which defendant made the defamatory statements or to whom they were made.  (See id. ¶ 291 ("Said knowingly false information and defamatory statements made by said individual school defendants . . . were disseminated and continue to be disseminated through news and social media and can still be found today on the Internet.").)

Such vague and conclusory allegations cannot withstand a motion to dismiss.  Therefore,

the Court dismisses Count XXIII.

### (vi)   Count XXIV (Invasion of Privacy: False Light)

To state a claim for the tort of false light, a plaintiff must allege (1) placement in a false light that would be highly offensive to a reasonable person and that (2) "the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."  Leang v. Jersey City Bd. of Educ., 969 A.2d 1097, 1116 (N.J. 2009).  "The publicized material in a false-light claim must constitute a 'major misrepresentation of [plaintiff's] character, history, activities, or beliefs.'"  Romaine v. Kallinger, 537 A.2d 285, 295 (N.J. 1988) (citation omitted).

Plaintiffs false light claim fails for similar reasons as did their claims for defamation. Plaintiffs' allegations do not identify what information was shared other than to say that "information about K.J.'s disability" was disclosed.  (FAC ¶ 304.)  Even then, Plaintiffs do not specify which defendant disclosed the information.  (See id. ("Information about K.J.'s disability was disclosed to the press by individual defendant school personnel.").)  Plaintiffs also contend that "articles and news stories contained images of bombs and bomb making materials, none of which were found and none of which K.J. had," but Plaintiffs do not factually connect School Defendants' actions to the news articles and stories allegedly holding K.J. in a false light.  (FAC ¶ 305.)  Because Plaintiffs have not stated a claim to relief that is plausible on its face, the Court dismisses Count XXIV.

## IV.   LEAVE TO AMEND

"[I]f a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile."  Phillips, 515 F.3d at 245 (citing Alston v. Parker, 363 F.3d 229, 235 (3d Cir. 2004)).  Indeed, even when "a

plaintiff does not seek leave to amend a deficient complaint after a defendant moves to dismiss it, the court must inform the plaintiff that he has leave to amend within a set period of time, unless amendment would be inequitable or futile." Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002).

Because the Court finds that Plaintiffs may be able to cure some of the pleading deficiencies identified above, the Court will grant Plaintiffs one final opportunity to seek leave to amend their FAC within fourteen days of the date of this Opinion and accompanying Order.[13] Plaintiffs may not seek leave to amend Count XV (Anti-Bullying Bill of Rights Act) because any amendment thereof would be futile.  With respect to the Counts summarily dismissed because of Plaintiffs' impermissibly vague group pleading, Plaintiffs must provide the Court in any proposed Amended Complaint factual allegations identifying which defendants, and which of their actions, are responsible for the violations alleged in each count.

## V.   CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss will be **GRANTED IN PART** and **DENIED IN PART**.  An appropriate order shall enter today.  Plaintiffs shall have **fourteen** (**14**) **days** from the date of this Opinion and accompanying Order to file a motion seeking leave to amend their Fourth Amended Complaint.


Dated:   8/26/2015                                        s/Robert B. Kugler

                                                         ROBERT B. KUGLER

                                                         United States District Judge

---

[13] If Plaintiffs files a Motion for Leave to Amend the FAC, it shall attach to the Motion a copy of the proposed Fifth Amended Complaint, as required by Loc. Civ. R. 7.1(f).