**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

| | |
|---|---|
| K.J., individually and on behalf of K.J., Jr., *et al.*, | : |
| | : |
| Plaintiffs, | :      Civil No. 14-0145 (RBK/JS) |
| | : |
| v. | :      **OPINION** |
| | : |
| GREATER EGG HARBOR REGIONAL HIGH SCHOOL DISTRICT BOARD OF EDUCATION, *et al.*, | : |
| | : |
| Defendants. | : |

**KUGLER**, United States District Judge:

This matter comes before the Court upon Plaintiffs' Motion for Summary Judgment (Doc. 173) and Defendants' Motion for Summary Judgment (Doc. 174). For the reasons contained herein, Plaintiffs' motion is DENIED and Defendants' motion is GRANTED IN PART and DENIED IN PART.

## I.    BACKGROUND

This matter arises out of events that took place at a New Jersey high school days after the tragic shooting at Sandy Hook Elementary School in Newtown, Connecticut on December 14, 2012. (Doc. 174-2 ("Def. Mot.") at 6.)[1] Three days after Sandy Hook, a high school teacher noticed a drawing in the sketchbook of her student, K.J., Jr. ("K.J."), that concerned her. When school officials reviewed K.J.'s sketchbook they found a drawing of what appeared to be a weapon, which prompted them to detain K.J. and call the police. The police searched K.J.'s home and found parts

---

[1] *See generally* James Barron, *Nation Reels After Gunman Massacres 20 Children at School in Connecticut*, N.Y. TIMES, Dec. 14, 2012, http://www.nytimes.com/2012/12/15/nyregion/shooting-reported-at-connecticut-elementary-school.html.

that might have been used to make the weapon depicted in the drawing. Shortly thereafter, K.J. was arrested and placed in a juvenile detention facility, where he remained for over two weeks. Upon his release, he was placed under house arrest and forced to wear an ankle monitor until, several months later, the judge presiding over his trial dismissed one of the charges entirely and found K.J. not guilty on the remaining counts. K.J.'s family later brought this action alleging that Defendants wrongfully deprived K.J. of lengthy periods of his high school education and violated multiple federal and state laws.

### A. The Parties

Plaintiffs are K.J. Jr.'s parents (K.J. Sr. and T.J.) and siblings (K.J. and C.J.); Plaintiffs bring their claims on behalf of K.J. as well as individually. (Doc. 65, Fifth Amended Complaint ("FAC") ¶A.) Many Defendants in this action were terminated at earlier points,[2] but a large number still remain: Greater Egg Harbor Regional High School Board of Education ("Egg Harbor") is a public school district located in New Jersey. (*Id.* ¶B.) Dr. Steve Ciccariello ("Ciccariello") is the Superintendent of Schools at Egg Harbor. (*Id.* ¶C.) John Ragan ("Ragan") is the District Supervisor of Special Services and is the Anti-Bullying Coordinator for Egg Harbor. (*Id.* ¶D.) Erin Byrnes is a school psychologist and Anti-Bullying Specialist at Cedar Creek High School ("Cedar Creek"), a school in Egg Harbor. (*Id.* ¶E.) James Reina ("Reina") is the Principal of Cedar Creek, (*id.* ¶F), and Michael McGhee ("McGhee") is the Vice Principal and Supervisor of Special Education at Cedar Creek. (*Id.* ¶H.) Scott Parker ("Parker") is or was also Vice Principal for Cedar Creek and is the Anti–Bullying Liaison for Cedar Creek. (*Id.* ¶I.) Christine Reina ("Christine") is the Homebound Instruction Coordinator for Cedar Creek. (*Id.* ¶G.) Megan Hallman ("Hallman") was

---

[2] Though named in the FAC, the Atlantic County Prosecutor's Office, Assistant Prosecutor Lauren Kirk, Assistant Prosecutor Anne Crater, the State of New Jersey, The New Jersey Department of Education, and Commissioner of Education Cerf have all been terminated from this action. (Docs. 89, 104, 152.)

K.J.'s geometry teacher at Cedar Creek. (*Id.* ¶J.) Gregory Ferree ("Ferree") is a German teacher and Homebound instructor at Cedar Creek. (*Id.* ¶K.) Paula Londono ("Londono") is a guidance counselor employed at Cedar Creek. (*Id.* ¶M.) Cori Koury ("Koury") and Maggie Holmes ("Holmes") were both case managers on the Child Study Team at Cedar Creek. (*Id.* ¶N.) Karen Cavalieri ("Cavalieri") is the Supervisor of the Guidance Department at Cedar Creek. (*Id.* ¶O.) Erin Hoban ("Hoban") is an Art Teacher at Cedar Creek. (*Id.* ¶P.) Stephanie Tarr ("Tarr") is an Event Coordinator with Egg Harbor. (*Id.* ¶Q.) Edward Ottepka ("Ottepka") is a school resource officer at Cedar Creek, and Ramone Valentine ("Valentine") is a school security officer at Cedar Creek. (*Id.* ¶R.)

## B. Factual History

Beginning in 2010, K.J. attended Cedar Creek, a magnet program for engineering. (Doc. 173-2 ("Pl. SOF") ¶32.) Though gifted in the areas of art, chemistry, and engineering, (*id.*), K.J. was also a student with disabilities who had been classified by Egg Harbor as "Other Health Impaired" for Attention Deficit Disorder. (*Id.* ¶13.) As a result, K.J. had been given an Individualized Education Program ("IEP"). (*Id.*) The IEP noted that K.J. doodled and drew in class; Plaintiffs allege this activity allowed K.J. to express himself, as well as concentrate and focus in class, while Defendants allege that this was more often a source of distraction. (*Id.* ¶33; Doc. 169-1 ("Def. RSOF") ¶33.) K.J. carried a personal sketchpad with him at school, in which he kept his drawings and doodles. (Pl. SOF ¶51.)

Prior to the drawing incident, K.J. had a separate disciplinary incident while attending Cedar Creek. (Pl. SOF ¶34.) On October 20, 2011, while on the school bus, K.J. attempted to recreate a YouTube video in which a person sprayed Axe deodorant on his arm and lit it with a lighter but was protected from being burned because of the deodorant's flame-retardant properties.

(Pl. SOF ¶34; Doc. 174-3 ("Def. SOF") ¶6.) K.J. was not as fortunate in his attempt, and ended up burning his arm. (*Id.*) After his experiment, K.J. was taken to the nurse and his backpack was searched, resulting in school officials finding two "mini pocketknives, a piece of metal another student found on the bus and gave to KJ," which Defendants describe as a "shiv," and an Exacto knife. (Pl. SOF ¶35; Def. SOF ¶35.) As a result of the fire and weapons, K.J. was removed from school and suspended at first for nine days, and then placed on home instruction until the end of January 2012. (*Id.* ¶36.) K.J. was evaluated as a result of the incident on October 26, 2011 by Dr. Hewitt, Egg Harbor's psychiatrist, who determined K.J. was not a danger to himself or others, and that K.J. had Asperger's Syndrome. (*Id.* ¶41.)

On December 14, 2012, a tragic shooting occurred at Sandy Hook Elementary School in Newtown, Connecticut. (Pl. SOF ¶43.) Three days later, on December 17, 2012, Hallman noticed a drawing that K.J. was creating during geometry class; Plaintiffs claim the drawing she saw was a "spaceman," while Defendants claim she saw a drawing of a "flame poofer." (*Id.* ¶44; Def. RSOF ¶44.) Hallman communicated her concern about the content of K.J.'s drawings to McGhee, who called K.J. out of class and took him to the Vice Principal's office late the next day, December 18, 2012. (Pl. SOF ¶45; Def. SOF ¶45.)

While K.J. was in the Vice Principal's office, McGhee repeatedly told him that he was not in trouble, though Valentine, the school safety officer, remained in or around McGhee's office the entire time. (Pl. SOF ¶47.) McGhee allegedly manipulated K.J. into showing him the drawings in K.J.'s sketchpad by leading K.J. to believe that he was genuinely interested in K.J.'s artwork and designs. (*Id.* ¶49.) In K.J.'s sketchpad there was an updated drawing of a superhero glove with a flame coming out of it, a concept drawing which K.J. allegedly started two years earlier based on

the Iron Man movie.[3] Plaintiffs allege that this drawing was done solely at K.J.'s home, was contained in K.J.'s personal, private sketchbook, and that K.J. never intended for anyone to see it. (*Id.* ¶50.)

The parties' stories diverge at this point. Defendants claim that after reviewing the drawings in K.J.'s sketchbook, McGhee asked K.J. if he had any items with him that were not allowed in school. In response, K.J. allegedly dumped the contents of his bookbag and pockets on McGhee's desk. (Def. SOF ¶¶20–21.) In contrast, Plaintiffs claim that K.J.'s bag was searched without his consent. After this, McGhee kept K.J. in his office and called K.J.'s mother, T.J., to inform her that K.J. was in his office but was not in trouble. (*Id.* ¶52.) Defendants allege that, sometime after McGhee's conversation with T.J., K.J. told McGhee he "was actually building the flame poofer weapon at home." (Def. RSOF ¶52.) Defendants claim this prompted McGhee and Reina to contact the police department. (*Id.*) In contrast, Plaintiffs claim that McGhee contacted the local police department while he was still on the phone with T.J., and intentionally kept her on the phone until the police arrived at her home. (Pl. SOF ¶53.) Plaintiffs state that the fire department, EMS, and bomb squad also arrived at Plaintiffs' home soon after the local police. (*Id.*)

K.J.'s father consented to a police search of K.J.'s home, though Plaintiffs claim he only did so because McGhee "deceived [T.J.] into believing that their son was not in any trouble." (Pl. SOF ¶54.) During their search, the police found items such as wires, thermite chemical, and switches. (*Id.* ¶55.) Plaintiffs claim these items were part of K.J.'s science and engineering homework. (*Id.*) While the police were searching Plaintiffs' home, Ottepka used his private car to transport K.J. to the police station. (*Id.* ¶56.) Hours later, the police took K.J. home. (*Id.* ¶57.)

---

[3] *See generally* IRON MAN (Paramount Pictures 2008).

Around this time, Ciccariello made the decision to issue an "All Call" to all families in the school district notifying them of what occurred. (Pl. SOF. ¶292.) County law enforcement brought bomb-sniffing dogs to the school to do a sweep, but did not find anything. (Doc. 173-26 ("Pl. Ex. O") at 47.)

At some point after the search of Plaintiffs' home, the Galloway Police Department contacted the Atlantic County Prosecutor's Office. (Pl. SOF ¶58.) K.J. was charged with a crime and placed in the Harborfield Juvenile Detention Center ("Harborfield"), where he spent seventeen days. (*Id.* ¶61.) While at Harborfield, Plaintiffs allege that K.J. was strip searched and cavity searched. (*Id.*) Upon K.J.'s release from Haborfield he was placed under house arrest: he was confined to his home and required to wear an ankle bracelet from early January 2013 until May 23, 2013. (*Id.* ¶63.) In January 2013, while K.J. was on house arrest, K.J.'s German tutor, Ferree, saw another one of K.J.'s drawings and attempted to confiscate it from Plaintiffs' home, allegedly on orders from Parker. (Id. ¶40.)

A criminal trial was held before Judge Jackson on May 21 and May 22, 2013. (Pl. SOF ¶64.) Before the trial began, Judge Jackson dismissed the second charge against K.J. (*Id.*) After expert testimony was taken, Judge Jackson found K.J. not guilty of the remaining charges against him because K.J. did not have the requisite malicious intent needed to substantiate the charges. (*Id.* ¶65.) Judge Jackson also determined, based on expert reports from the State and on behalf of K.J., that the glove device found in K.J.'s home would not constitute a weapon, even upon completion. (*Id.*) K.J.'s ankle bracelet was removed the following day. (*Id.* ¶66.)

While K.J. was on house arrest, he was placed on home instruction. (Pl. SOF ¶70.) After his charges were dismissed, the Child Study Team met, classified K.J. as having Asperger's Syndrome and ADHD and determined that K.J. should be placed in an "out District placement at

the YALE School or Coastal Learning Center." (Def. SOF ¶¶33-34.) Plaintiffs disagreed with the recommendation and filed a "Due Process Petition" pursuant to the Individuals with Disabilities Education Act ("IDEA") with the Office of Special Education in the New Jersey Department of Education in January 2014. (Doc. 173-6, "Due Process Petition.") This administrative proceeding resulted in an eventual settlement, approved by Administrative Law Judge Bruce Gorman, that allowed K.J. to return to Cedar Creek in March 2014 on a "shortened day program." (Doc. 173-7, "Settlement Agreement"; Def. SOF ¶¶35–37; Pl. SOF ¶72.)

Plaintiffs add that, in addition to keeping K.J. from attending Cedar Creek from December 2012 to March 2014, Defendants also interfered with K.J.'s education in other ways. For example, in fall 2013, allegedly on directions from Reina, Tarr prohibited K.J. from attending a class trip to the Smithsonian that he had already paid the deposit for, alerting the venue that he was a "behavior issue." (Pl. SOF ¶¶340–341.) Plaintiffs also assert that, the year after K.J. graduated high school, a current Cedar Creek student invited him to prom, but Reina prohibited K.J. from attending. (Pl. SOF ¶¶45–46.) Further, at many points in their statement of facts, Plaintiffs generally aver that Egg Harbor harassed, intimidated, bullied, retaliated against, and cyber-bullied K.J., failed to comply with the mandatory investigation requirements under the New Jersey Anti-Bullying Bill of Rights, and created a hostile school environment.

### C. Procedural History

Plaintiffs initially filed this case in January 2014, and it has since become a tangled web of parties and motions. In the operative complaint—the Fifth Amended Complaint ("FAC")— Plaintiffs asserted twenty counts against a litany of defendants. Defendants then moved to dismiss the FAC, which this Court's December 30, 2016 Opinion granted in part and denied in part, resulting in the dismissal of some of the twenty counts. (Doc. 88.) Additionally, several Defendants

have been terminated since the FAC was filed. As it currently stands, Defendants in this case include: Egg Harbor; the "Child Study Team at Cedar Creek High School"; and individual Defendants Dr. Steve Ciccariello, John Ragan, Erin Byrnes, James Reina, Christine Reina, Michael McGhee, Scott Parker, Megan Hallman, Gregory Ferree, Maggie Holmes, Paula Londono, Cori Koury, Karen Cavalieri, Erin Hoban, Stephanie Tarr, Edward Ottepka, and Ramone Valentine.

The surviving counts in the FAC are as follows: Count I, violation of Section 504 of the Rehabilitation Act; Count II, violation of the Americans with Disabilities Act ("ADA"), Count III, violation of the New Jersey Civil Rights Act ("NJCRA"); Count IV, stating that Defendants are "Persons" under 42 U.S.C. § 1983;[4] Count V, § 1983 claim for violation of the Fourth Amendment; Count VI, § 1983 claim for violation of the First Amendment; Count VII, § 1983 claim for violation of the Fourteenth Amendment; Count XI, New Jersey Law Against Discrimination ("NJLAD") disability discrimination; Count XII, NJLAD hostile learning environment; Count XIII, NJLAD "aiding and abetting"; Count XIV, NJLAD retaliation; Count XV, vicarious liability; Count XVI, intentional infliction of emotional distress; and Count XX, negligence, gross negligence, and respondeat superior.

Plaintiffs and Defendants have both moved for summary judgment on all counts. (Docs. 173, 174.)

## II.    LEGAL STANDARD

---

[4] Count IV states that Defendants are persons for purposes of § 1983, and then very briefly states that Defendants violated K.J.'s First Amendment and Fourteenth Amendment rights. In the Court's December 30, 2016 Opinion (Doc. 88) in this case, it recognized that Plaintiffs used Count IV to set out preliminary information that they then incorporate into their other § 1983 claims. While recognizing that there is no separate or substantive claim in Count IV, the Court will continue allowing this claim to stand so long as Plaintiff's substantive § 1983 claims remain.

The court should grant a motion for summary judgment when the moving party "shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "material" to the dispute if it could alter the outcome, and a dispute of a material fact is "genuine" if "a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Matsushida Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289 (1968)). In deciding whether there is any genuine issue for trial, the court is not to weigh evidence or decide issues of fact. *Anderson*, 477 U.S. at 248. Because fact and credibility determinations are for the jury, the non-moving party's evidence is to be believed and ambiguities construed in his favor. *Id*. at 255; *Matsushida*, 475 U.S. at 587.

Although the movant bears the burden of demonstrating that there is no genuine issue of material fact, the non-movant likewise must present more than mere allegations or denials to successfully oppose summary judgment. *Anderson*, 477 U.S. at 256. The nonmoving party must at least present probative evidence from which jury might return a verdict in his favor. *Id.* at 257. The movant is entitled to summary judgment where the non-moving party fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.   DISCUSSION

### A.  Claims under Section 504 and the ADA

Plaintiffs bring Count I, Violation of Section 504 of the Rehabilitation Act, and Count II, Violation of the ADA, against Egg Harbor only, seeking compensatory damages. (FAC ¶¶51–

65.).[5] Plaintiffs and Defendants both move for summary judgment on these claims. The ADA and Rehabilitation Act both "prohibit certain disability-based discrimination." *Weidow v. Scranton Sch. Dist.* 460 F.App'x 181, 184 (3d Cir. 2012). Because the Third Circuit interprets the ADA "in a manner consistent with the Rehabilitation Act," these counts are analyzed together. *Id.*

To make out a prima facie claim for discrimination under the ADA or Rehabilitation Act, the plaintiff must establish that (1) he "has a disability" (2) he is "otherwise qualified to participate in the services, programs, and activities of the school," (3) the program receives "federal financial assistance,"[6] and (4) he was "denied the benefits of" or "subject to discrimination" under the program because of his disability. 29 U.S.C. § 794(a); *see also Nathanson v. Med. Coll. of Pa*., 926 F.2d 1368, 1380 (3d Cir. 1991); *Weidow*, 460 F.App'x at 184–85. A plaintiff may not make out a claim "simply by proving (1) that he was denied some service and (2) he is disabled. The [school] must have failed to provide the service for the sole reason that the child is disabled." *Andrew M. v. Delaware Cty. Office of Mental Health & Mental Retardation*, 490 F.3d 337, 350 (3d Cir. 2007).

Within the Third Circuit, "a plaintiff seeking compensatory damages on a § 504 claim must also prove that the discrimination at issue was intentional." *Shadie v. Hazleton Area Sch. Dist*., 580 F. App'x 67, 70 (3d Cir. 2014). To show "intentional discrimination," the plaintiff must offer "proof that, at a minimum, the school district exhibited 'deliberate indifference' to the underlying act of discrimination." *Id*. A plaintiff can establish deliberate indifference by showing "(1) *knowledge* that a federally protected right is substantially likely to be violated and (2) *failure to act* despite that knowledge." *Id*. (emphasis in original).

---

[5] The Complaint also alleges this Count against the New Jersey Department of Education, but that party has been terminated from this case.

[6] Because "the ADA applies to all state and local government activities," a claim under the ADA does not require showing this element. *Weidow*, 460 F. App'x at 185.

Here, the "program" Plaintiffs allege K.J. was denied access to was education at Cedar Creek during two periods: after the lighter incident on the bus in October 2011, and after the drawing incident in December 2012. (Def. Mot. at 10; Doc. 173-1 ("Pl. Mot.") at 9.) They claim K.J. was discriminated against when he was kept out of school and placed on homebound instruction due to his disabilities—Asperger's Syndrome and ADHD—and the manifestations thereof. (Def. Mot. at 10.) In both incidents, the parties dispute element (4), whether he was "denied benefits of or subject to discrimination under the program." Arguments specific to each incident are addressed below.

### *October 20, 2011 Incident*

After the incident on October 20, 2011, in which K.J. lit his arm on fire and school officials found knives in his bag, K.J. was initially suspended for nine days. (Def. Mot. at 11.) McGhee, Ragan, and Reina then met with K.J.'s parents during an "administrative review hearing" on November 3, 2011, and at that meeting determined that K.J. should be placed on homebound instruction "for the remainder of the marking period," and could return to Cedar Creek in January 2012. (*Id.*; Doc. 173-12.)

Plaintiffs allege that the decision to keep K.J. from attending Cedar Creek between October 20, 2011 and January 2012 violated the ADA and Rehabilitation Act because K.J.'s suspension and change in placement were due to the manifestation of his disability. Plaintiffs argue that K.J.'s disability (Asperger's Syndrome) caused him to be unaware that it was wrong to bring knives to school. (Doc. 168 ("Pl. Resp.") at 4.) Thus, bringing knives to school was allegedly a manifestation of K.J.'s disability. As support, Plaintiffs offer the October 26, 2011 psychiatric evaluation conducted by Dr. James Hewitt following the lighter incident. (Pl. Resp. at 5; Doc. 173-9.) Dr. Hewitt stated in his evaluation, "I think what [K.J.] did has to be understood in the nature of his

disability and, in part, was a manifestation of his disability . . . His inability to see the context of what it meant to take knives to school is a function of his disability." (*Id*.)

Defendants argue that Plaintiffs offer no evidence of discrimination because they fail to show that K.J. was suspended due to his disability, and they claim K.J. was actually suspended for bringing weapons to school. (Def. Mot. at 13.) Defendants add that, while Plaintiffs may argue that the homebound instruction K.J. received for the period of his suspension was insufficient, they cannot show that it "amounted to a denial of access to a public education." (Def. Mot. at 13; Pl. Resp. at 5.) Plaintiffs point out that suspending K.J. for bringing weapons to school *is* suspending him because of his disability, per Dr. Hewitt's report. They add that Defendants failed to hold a "manifestation hearing pursuant to the IDEA's Regulations Sections 300.530 (c), (e) and (f) to determine if" K.J.'s actions were actually a manifestation of his disabilities.[7] (Pl. Mot. at 10.) Defendants argue that the November 3, 2011 administrative review hearing fulfilled the same procedural requirements as a manifestation hearing, and nonetheless resulted in K.J.'s being placed on homebound instruction. (Def. Reply at 4.)

Although Defendants argue that the manifestation hearing and the administrative review hearing are essentially the same, it is unclear from the record what procedures were followed or what occurred at the administrative review hearing. Two pieces of evidence are provided regarding the hearing: (1) a "teacher response form" (Doc. 173-12 at 37), in which seven teachers each detail

---

[7] A "manifestation hearing" is a meeting held pursuant to IDEA to ascertain whether a student's behavior that violated a school code was a manifestation of that student's disability. 20 U.S.C. § 1415(k). The IDEA requires schools to hold a manifestation hearing "within 10 school days of any decision to change the placement" of the student. § 1415(k)(1)(E). At this meeting, "the local educational agency, the parent, and relevant members of the IEP Team" are instructed to "review all relevant information in the student's file, including the child's IEP, any teacher observations, and any relevant information provided by the parents to determine" whether the improper conduct was caused by the student's disability or the district's failure to properly implement the child's IEP. *Id*. If the hearing concludes that the behavior constituted a manifestation of the disability, the IEP Team must conduct a functional behavioral assessment, implement or review the behavioral intervention plan, and immediately return the student to his previous placement. § 1415(k)(1)(F).

their observations of K.J.'s effort in class, academics, attitude, and current grade, and (2) a letter from Reina that purports to "summarize the Administrative Review meeting." (Doc. 173-12 at 40.) Reina's summary states that those present at the meeting "thoroughly reviewed [K.J.'s] academic, attendance, and discipline records. (*Id.*) It makes no mention of K.J.'s disabilities or Dr. Hewitt's report.

The Court finds that a factual dispute thus exists as to whether Defendants considered whether K.J.'s actions were a manifestation of his disability before changing his educational placement, and consequently whether K.J.'s suspension was based on his disability. While a manifestation hearing is not explicitly required under Section 504, it is unclear whether Dr. Hewitt's report was even considered at all, and whether its findings that K.J.'s actions were manifestations of his disability were adopted or rejected. Thus, it is also unclear whether Defendants intentionally suspended K.J. and placed him on homebound instruction for actions they believed or knew were a manifestation of his disability.

Because this factual issue exists, the Court declines to grant summary judgment for either party on Counts I and II as related to the October 26, 2011 incident. *See Gutin v. Washington Tp. Bd. of Educ.,* 467 F.Supp.2d 414, 429 (D.N.J. 2006) (denying summary judgment where it would require the court's determination of whether a student's behavior was a manifestation of his disability); *see also J.S.X. Through D.S.X. v. Foxhoven*, 361 F. Supp. 3d 822, 837 (S.D. Iowa 2019) (denying summary judgment upon finding "a genuine factual dispute as to whether Plaintiffs were isolated based on legitimate safety concerns, or instead based on manifestations of their disabilities that neither implicated those concerns nor warranted the restrictive measures utilized by the School").

### *December 2012 Incident*

In December 2012, Hallman claims she saw K.J. drawing a "flame poofer" weapon in close temporal proximity to the Sandy Hook incident. (Def. Mot. at 12.) Though Plaintiffs argue that Hallman only saw K.J. drawing a "spaceman," Defendants allege that further investigation revealed K.J. was also drawing a nail bomb and remote detonator, and that K.J. was building a "flame poofer" at home. (*Id*.) The drawings and ensuing events resulted in criminal charges that were not dismissed until May 2013. (*Id*. at 13.)

Plaintiffs argue that K.J. should have been allowed to return to Cedar Creek upon the dismissal of charges in May 2013, but that Defendants violated the ADA and Rehabilitation Act by barring K.J. from returning until March 2014 and keeping him on homebound instruction in the interim. Plaintiffs claim Defendants sought to keep K.J. out of Cedar Creek due to his drawings, an alleged manifestation of his disabilities. Specifically, they argue that Defendants discriminated against K.J. for his "clear inability to understand [the drawings'] alleged inappropriateness in a school setting," which "was a well-documented manifestation of his disabilities/handicaps." (Pl. Resp. at 7.) Defendants contend that they were not punishing K.J. for his disabilities or manifestations thereof, but instead sought an alternative placement because it would better suit K.J.'s ADHD and Asperger's Syndrome. (Def. Reply at 7.)

As with the October 2011 incident, an issue of fact exists here, namely, whether Defendants sought an out-of-district placement because they were discriminating against K.J.'s disabilities, or because they actually believed another placement would best suit his educational needs. In a December 2012 email to Ciccariello, Reina states, "Obviously, I do not want this kid to ever step foot in [Cedar Creek] again. I believe he should be a candidate for an Out-of-District Placement." (Doc. 173-12 at 48.) Additional emails in March and May 2013 from Holmes to Ragan (Doc. 173-12 at 53–54) potentially imply that Defendants were attempting to place K.J. in an out-of-district

placement regardless of what his IEP or manifestation hearing concluded was best for his disabilities. This suggestion is bolstered by the fact that a manifestation hearing was never actually held.

However, some evidence in the record cuts the opposite way: in his deposition, Reina explains that, while his statement "I do not want this kid to ever step foot in Cedar Creek again" expressed frustration with K.J.'s behavioral issues, his next sentence, "I believe he should be a candidate for an Out-of-District Placement," was motivated by his genuine belief that an out-of-district placement "was better suited to his needs and abilities" and that K.J. could be "more successful in a different setting." (Doc. 171-3 at 73.) Reina added that Egg Harbor was never dead-set on excluding K.J. from Cedar Creek, and instead felt the question was "whether or not he was eligible for an out-of-district placement or he would be returned to the building with additional modifications and/or impacts." (*Id*. at 93.)  Notes from a February 19, 2014 IEP meeting detailed the process of recommending alternate placements, and potentially imply that Dr. Hewitt's recommendations and K.J.'s parents' preferences were taken into account in the process. (Doc. 173-9 at 22.)

Particularly considering the "intentional discrimination" standard for compensatory damages, a reasonable jury could, after weighing the conflicting evidence in the record, determine that Defendants simply sought the best educational opportunities for K.J. However, a reasonable jury could also determine that Defendants attempted to exclude K.J. because they were frustrated with the ways his disability manifested. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004). As such credibility determinations and

weighing of evidence would be required here, summary judgment is inappropriate for either party on Counts I and II.

### B.  42 U.S.C. § 1983 and NJCRA Claims[8]

Plaintiffs allege violations of the Fourth, First, and Fourteenth Amendments under 42 U.S.C. § 1983 and the NJCRA against a number of Defendants in their individual capacities.[9]

### i.      Fourth Amendment

Plaintiffs allege that McGhee, Ottepka, and Valentine violated K.J.'s Fourth Amendment rights by "seizing and searching KJ, Jr's person and belongings without any reasonable basis" in the aftermath of the December 2012 drawing incident.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend IV. The Fourteenth Amendment extends this constitutional guarantee to searches and seizures by state officers. *New Jersey v. T.L.O.*, 469 U.S. 325, 335 (1985) (citing *Elkins v. United States*, 364 U.S. 206, 213 (1960)). As state officers, public school officials, too, are subject to the Fourth Amendment's prohibition on unreasonable searches and seizures. *Id.*

However, "[t]he school setting requires some easing of the restrictions to which searches by public authorities are ordinarily subject." *T.L.O.*, 469 U.S. at 340. Because school officials must effectively balance a student's privacy interest against the "school's equally legitimate need to

---

[8] Plaintiffs bring claims under the NJCRA in Count III, and claims under § 1983 in Counts V, VI, and VII. Courts in this Circuit have consistently interpreted the NJCRA and Section 1983 analogously, *see Szemple v. Corr. Med. Servs., Inc.*, 493 F. App'x 238, 241 (3d Cir. 2012), and New Jersey courts have extended that approach to the issue of qualified immunity. *See, e.g., Ramos v. Flowers*, 56 A.3d 869, 876 (N.J. Super. Ct. App. Div. 2012). As such, the Court analyzes the parties' arguments on the Section 1983 and NJCRA claims in tandem.

A section in Plaintiff's motion for summary judgment inexplicably alleges an additional violation of § 1983 for the Defendants' "deliberate indifference" towards K.J. (Pl. Mot. at 20–23.) This is not a proper § 1983 cause of action, and this argument is not considered here.

[9] This Court's previous Opinion in this case, *K.J. v. Greater Egg Harbor Reg'l High Sch. Dist. Bd. of Educ.*, Civ. No. 14-145, 2015 WL 5039460 (D.N.J. Aug. 26, 2015), dismissed Plaintiff's § 1983 claims against individual defendants in their official capacities, and dismissed Plaintiffs' § 1983 claims against Egg Harbor.

maintain an environment in which learning can take place," the Fourth Amendment standard stops short of probable cause. *Id*. The search must instead be reasonable under the circumstances, meaning it must be "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place." *Id*. (internal quotations omitted). A search is "justified at its inception when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *Id.* at 341–342. Similarly, a seizure of a student in public school is also governed by the reasonableness standard. *See Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 148 (3d Cir. 2005) (joining other U.S. Courts of Appeals in adopting the reasonableness standard).

At the outset, there exists a factual dispute over whether Defendant Hallman saw K.J. drawing a "spaceman" as Plaintiffs allege, or whether Hallman saw K.J. drawing a "flame poofer" as Defendants allege. (Pl. SOF ¶44; Def. RSOF ¶44.) Though this dispute of fact exists, it is not material, as both drawings could clearly be considered to depict weapons. The "spaceman" drawing (Doc. 174-9) depicts a figure holding a gun, or other gun-like object. Thus, even if Hallman saw the "spaceman" drawing as Plaintiffs allege, her concern over K.J. drawing a weapon was still reasonable.

When Hallman approached and asked K.J. what he was drawing, he responded, "a drawing," and refused to discuss further. (Doc. 173-23 at 21–22.) Hallman did not immediately seize K.J.'s sketchbook, but instead communicated her concern to McGhee. (*Id.* at 25.) The following day, McGhee took K.J. out of class to question him about the drawing. (*Id.*) McGhee did not immediately search K.J.'s bag or pockets, but instead asked only to see the drawings in his sketchbook.

McGhee's search of the sketchbook was justified at its inception – he knew K.J. had in fact brought weapons to school in the past, and believed K.J. was drawing another weapon now, particularly in light of K.J.'s reticence when answering Hallman's question about his drawing. Thus, McGhee had "reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *T.L.O.*, 469 U.S. at 341–342. The search was also limited in scope, as McGhee was only looking through one notebook, and did so in the privacy of an office. Accordingly, McGhee's search of the sketchbook was reasonable under the circumstances due to his knowledge of K.J.'s past issue with bringing weapons to school and the search's limited scope. *See E.T., a minor, by his parents v. Bureau of Special Educ. Appeals of the Div. of Admin. Law Appeals*, 169 F. Supp. 3d 221, 245 (D. Mass. 2016) (finding a school official's search of a student's notebook reasonable under the circumstances due to the student's disturbing drawings and past disciplinary issues).

Once McGhee saw the drawings in K.J.'s sketchbook—which included diagrams of a nail bomb and a detonator, a drawing of someone throwing an exploding nail bomb at another person, and a list of required parts—McGhee then discussed the drawings with K.J., who stated that he was making one of the drawings at home. At that point, McGhee searched K.J.'s backpack and pockets. This search in McGhee's office was also clearly "justified at its inception," as McGhee saw diagrams for weapons in K.J.'s sketchbook and wanted to ensure that K.J. had not, again, been carrying weapons in his bag. The search was also limited in scope, as McGhee searched only K.J.'s backpack—a place he knew K.J. had kept knives before—and his pockets. Because both searches were reasonable under the circumstances, summary judgment is appropriate for Defendants on this issue.

Alternatively, summary judgment is appropriate for Defendants on grounds of qualified immunity. "Under the doctrine of qualified immunity, government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional laws of which a reasonable person would have known." *Lawson v. E. Orange Sch. Dist.*, Civ. No. 16-2704, 2017 WL 751425, at *5 (D.N.J. Feb. 27, 2017). "To be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Wrench Transp. v. Bradley*, Civ. No. 95-06203, 2007 WL 4233011, at *5 (D.N.J. Nov. 29, 2007), *aff'd sub nom. Wrench Transportation Sys., Inc. v. Bradley*, 340 F. App'x 812 (3d Cir. 2009). Qualified immunity is broad in scope, and "protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Here, it was reasonable for Defendants to "believe that the searches of [K.J.'s belongings] were justified by his behavioral history and the potential threat to school safety." *E.T.,* 169 F.Supp.3d at 245.[10]

Plaintiffs also argue that K.J. suffered a seizure of his person when he was kept in McGhee's office, and when he was transported from the school to the police department. As to being detained in McGhee's office, K.J. claims he was held in the office for "too long," but cannot say that he was in the office for more than an hour. (Doc. 173-23 at 32–33.) Keeping K.J. in McGhee's office for roughly an hour while determining if he had a weapon is reasonable under the circumstances, and judgment is warranted for Defendants on this claim. *See Shuman*, 422 F.3d

---

[10] Plaintiff argues that, because this Court barred Defendants from asserting a qualified immunity defense on their earlier motion to dismiss, all qualified immunity defenses should be rejected now at the summary judgment stage. This is an inaccurate statement of law. *See, e.g., Lodato v. Ortiz*, 314 F. Supp. 2d 379, 388 (D.N.J. 2004) ("Plaintiff also argues that qualified immunity should be precluded as law of the case because the Court already denied the Defendants' motion to dismiss based on qualified immunity. This argument must fail. The defense can be denied on a motion to dismiss, yet upheld on a motion for summary judgment."); *S.C. v. Deptford Twp. Bd. of Educ.*, Civ. No. 01-5127, 2006 WL 1784591, at *14 (D.N.J. June 23, 2006) ("the law of the case doctrine does not prevent a court from granting summary judgment where a court previously denied a motion to dismiss using the more liberal standards governing Rule 12 motions").

at 149 (finding that, when a school kept a student in a small conference room for four hours while investigating misconduct allegations, the school's seizure was reasonable under the circumstances).

As to Defendant Ottepka, he is entitled to qualified immunity for transferring K.J. to the police department. Ottepka knew that K.J. was drawing diagrams of weapons in his sketchbook, had written out a "parts list," and believed K.J. was creating a weapon. (Doc. 174-11 at 6–8.) Ottepka was told that the Galloway Police Department was contacting K.J.'s parents, and that because school officials believed K.J. was building a weapon, Ottepka should take him to the police station. Based on these circumstances, a reasonable school official in Ottepka's position would not believe that driving K.J. approximately 15 minutes to the police station was a seizure that violated K.J.'s clearly established Fourth Amendment rights. (*Id.*) "Qualified immunity applies unless it is beyond debate that an officer acted unreasonably." *Pino v. Carey*, Civ. No. 15-1172, 2017 WL 6210950, at *8 (M.D. Pa. June 16, 2017). Here, it cannot be said it was "objectively unreasonable" for Ottepka to believe that his conduct was warranted under the circumstances. *Id*. He is accordingly entitled to the protection of qualified immunity. *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

Summary judgment is granted in favor of all Defendants on Plaintiffs' claims for violation of the Fourth Amendment in Counts III and V.

### ii. First Amendment

Plaintiffs allege that Defendants McGhee, Reina, Ciccariello, Ferree, and Parker violated K.J.'s First Amendment rights on several occasions. First, they allege K.J.'s rights were violated when Defendants penalized him for his December 2012 drawing in Hallman's class and when they reported the drawing to the police department, effectively punishing K.J. for "self-expression."

(Pl. Mot. at 7.) Plaintiffs also argue that K.J.'s First Amendment rights were violated when Ferree, allegedly on orders from McGhee and Parker, attempted to confiscate one of K.J.'s drawings from his home. (Pl. Mot. at 8.)

"The First Amendment unquestionably protects the free speech rights of students in public school." *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 926 (3d Cir. 2011). However, students' constitutional rights "are not automatically coextensive with the rights of adults in other settings" because the First Amendment must be applied with regard to the unique circumstances present in the school environment. *Id.* (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 506, 506 (1969)). Thus, the Supreme Court has held that the speech of public school students may not be abridged unless the speech will "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." *Tinker*, 393 U.S. at 509. A "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint" is insufficient. *J.S. ex rel. Snyder*, 650 F.3d at 926 (quoting Tinker, 393 U.S. at 509). "Tinker requires a specific and significant fear of disruption, not just some remote apprehension of disturbance." *Id.* (internal quotation marks omitted). However, while "the burden is on school authorities to meet *Tinker*'s requirements to abridge student First Amendment rights, [a school] need not prove with absolute certainty that substantial disruption will occur." *Id.* at 928.

Defendants argue that Plaintiffs have not established that the drawings of weapons were entitled to First Amendment protection or that such drawings could not be regulated in school. (Def. Mot. at 18.) Defendants claim K.J.'s December 2012 drawings were reported because the drawings depicted weapons, one of which K.J. allegedly said he was building at home. (*Id.*) Further, Defendants argue that Ferree reported the drawing he saw at K.J.'s home because it depicted one of his teachers in a disturbing manner. (*Id.*; Pl. Mot. at 14.) Because no action was

taken against K.J. after Ferree's report, Defendants argue Ferree's report cannot constitute a First Amendment violation. (Def. Mot. at 18.)

Typically, the "first step in addressing a First Amendment claim is determining whether the plaintiff's speech is protected at all." *E.T.,* 169 F.Supp.3d at 246. However, most courts that have addressed First Amendment claims involving potentially violent drawings have declined to consider whether such drawings constitute "true threats" that are not protected by the First Amendment, *Watts v. United States*, 394 U.S. 705, 708 (1969), and have instead simply assumed at the first step that the drawings are protected speech. *See, E.T.*, 169 F.Supp.3d at 246. (collecting cases). This Court follows a similar approach and assumes for the purposes of summary judgment that K.J.'s drawings were protected speech.

The issue here is thus "whether the school's response to the potentially violent speech violated the First Amendment." *E.T.,* 169 F.Supp.3d at 246. Under *Tinker*, a school's response does not violate the First Amendment if the speech will "materially and substantially interfere with" the operation of the school. 393 U.S. at 509. School "administrators may limit student speech to prevent material disruption in schools when they have more than an undifferentiated fear or apprehension of disturbance." *E.T.*, 169 F. Supp. 3d at 247 (citing *Tinker*, 393 U.S. at 508–509).

Defendants' response to K.J.'s drawings did not violate the First Amendment. K.J. had previously caused a material and substantial disruption by bringing weapons to school and by lighting his arm on fire on the school bus. It was against this background that the school officials determined how to respond to K.J.'s art, which included a diagram of a nail bomb, a violent depiction of a person throwing a nail bomb at another person, a diagram of how to build a remote detonator, a "flame poofer," a spaceman holding a weapon, and a list of "parts." The art at K.J.'s house was a disturbing depiction of his teacher, Hallman. Numerous courts have found that schools

do not violate the First Amendment by reporting or suspending students for their disturbing or violent art. *See, e.g., Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109, 113 (2d Cir. 2012) (stating "in the context of student speech favoring violent conduct, it is not for courts to determine how school officials should respond. School administrators are in the best position to assess the potential for harm and act accordingly"); *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 984 (9th Cir. 2001) (finding that emergency expulsion of a student who wrote a violent poem did not violate the student's First Amendment rights); *J.R. by & Through Redden v. Penns Manor Area Sch. Dist.*, 373 F. Supp. 3d 550 (W.D. Pa. 2019) (finding the school did not violate a student's First Amendment rights when it suspended a student and reported him to the police for discussing a "hypothetical scenario" about shooting people in school, despite the student seemingly having no actual plans to commit a shooting); *E.T.,* 169 F.Supp.3d at 250 (finding that the school did not violate a student's First Amendment rights when it suspended him for a violent drawing).

Here, Defendants' response—suspending K.J. and reporting him to the police—was based on "the potential for substantial disruption," and "was foremost concerned about student safety." *LaVine*, 257 F.3d at 990–991. Although "[i]n retrospect, it may appear that . . . the school overreacted," at the time, Defendants "had facts which might reasonably have led them to forecast a substantial disruption of or material interference with school activities." *Id.* "School officials must have the ability to react to threats of school violence, regardless of whether the student has the actual capacity to carry out the threat." *J.R.*, 373 F.Supp.3d at 564 (collecting cases). Defendants' response to K.J.'s drawings cannot be said to have violated K.J.'s First Amendment rights. Summary judgment is accordingly granted for Defendants on this claim.

### iii.   Fourteenth Amendment Procedural Due Process

To establish a prima facie case of a procedural due process violation, a plaintiff must establish: (1) a deprivation of a constitutionally protected liberty or property interest, (2) state action, and (3) constitutionally inadequate process. *See Rusnak v. Williams*, 44 F. App'x 555, 558 (3d Cir. 2002) ("Procedural due process claims, to be valid, must allege state sponsored deprivation of a protected interest in life, liberty or property. If such an interest has been or will be deprived, procedural due process requires that the governmental unit provide the individual with notice and a reasonable opportunity to be heard.") (citation omitted); *Shoats v. Horn*, 213 F.3d 140, 143 (3d Cir. 2000). Regarding the process required under the Fourteenth Amendment, "due process is not a fixed concept, but a flexible doctrine that varies with the particular circumstances." *Van de Zilver v. Rutgers Univ.*, 971 F.Supp. 925, 932 (D.N.J. 1997) (citing *Zinermon v. Burch*, 494 U.S. 113, 127 (1990)). The "requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Kahn v. United States*, 753 F.2d, 1208, 1218 (3d Cir. 1985).

Here, Plaintiffs claim that Egg Harbor "and the school employees prevented [K.J.] from attending school and denied him his right to a hearing and appeal" on two separate occasions: after the October 2011 incident, and after the December 2012 incident. (Pl. Mot. at 9.)

The Supreme Court in *Goss v. Lopez,* 419 U.S. 565 (1975), held that a student's right to a public education can be considered a property interest protected by the Due Process Clause. "Once it is determined that due process applies, the question remains what process is due." *Goss*, 419 U.S. at 577. For school suspensions of ten days or less, students "are entitled to minimum procedural due process rights: 'due process requires that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story.'" *M.G. v. Crisfield*, 547 F. Supp. 2d 399,

415 (D.N.J. 2008) (quoting *Goss*, 419 U.S. at 581). For suspensions exceeding ten days, a heightened—though not clearly defined—standard applies. *Id.*

**October 2011 incident**[11]

Plaintiffs argue that K.J. was not given notice or a hearing before being suspended and placed on homebound instruction from October 2011 through January 2012. (Pl. Resp. at 19.) They claim that "no actual hearing or discussions took place," and that they were not given any opportunity to appeal. (*Id.*)

As noted earlier, it is unclear from the record what exactly transpired at the November 3, 2011 meeting, in which it was decided that K.J. would be placed on homebound instruction for the remainder of the marking period. If this meeting did constitute a hearing, then Plaintiffs' argument that they did not receive notice is likely unavailing, as "[t]here need be no delay between the time 'notice' is given and the time of the hearing." *Goss*, 419 U.S. at 582. However, it is unclear if this conference fits the mold of a hearing. The record does not show whether K.J. or his parents were granted an opportunity to "present his side of the story," or what other procedural safeguards were applied. Plaintiffs claim that when they arrived at the meeting, Defendants' decision as to K.J.'s ability to return to school was already made. Plaintiffs further argue that K.J. was not given a manifestation hearing prior to the decision made on November 3, 2011. (Pl. Mot. at 10–11.) As detailed earlier, Defendants argue that the November 3 meeting met the same requirements as a manifestation hearing. Because neither party has produced an undisputed account of what transpired at this meeting—or "hearing," as Defendants refer to it—the Court cannot determine whether it satisfied procedural due process, particularly in light of *Goss*' determination that for suspensions lasting more than ten days, something more than notice of the charges and an

---

[11] Defendants do not make any arguments in their moving briefs regarding the October 2011 suspension, so summary judgment is denied for Defendants as to this portion of the claim.

opportunity to explain is required. *Goss*, 419 U.S. at 581. Plaintiffs' motion for summary judgment as to this incident is denied.

### December 2012 Incident

Defendants argue that as to the second time period, between dismissal of K.J.'s criminal charges in May 2013 and his return to Cedar Creek in March 2014, procedural due process requirements were satisfied through the criminal system and through an administrative forum. (Def. Mot. at 19.) They note that K.J. was able to file a due process petition in January 2014 to dispute Defendants' proposed educational placement. (*Id.*) Defendants also argue that Plaintiffs fail to identify how each individual Defendant violated K.J.'s rights, and assert that they are entitled to qualified immunity. (Doc. 169 ("Def. Resp.") at 13; Def. Mot. at 20.) Plaintiffs argue that the administrative proceeding in which they filed the Due Process Petition "does not excuse the Defendants' repeated violations of [K.J.'s] rights; rather, Plaintiffs were forced to seek justice for themselves in accordance with the law." (Pl. Resp. at 20.)

This situation presented here differs from the one in October 2011. There, the issue was whether K.J.'s suspension from school deprived him of his property interest in education. Here, the issue is whether Defendants' attempt to change K.J.'s educational placement from Cedar Creek to the YALE School or Coastal Learning deprived him of his property interest in education. Essentially, Plaintiff are arguing here over K.J.'s "legally appropriate placement," asserting that K.J. should remain in "the school district as a regular education student." *M.G. v. Crisfield*, 547 F.Supp.2d at 418. They are not arguing over suspension or expulsion from school. Thus, the question before the court is what kind of process is due before a state changes the educational placement of a student with special needs.

Plaintiffs fail to show why a due process hearing pursuant to the IDEA does not satisfy due process requirements in such a case. "A due process violation is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process." *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000) (internal quotations omitted). Plaintiffs repeatedly emphasize that K.J. was deprived of his right to an education when Defendants did not allow him to return to Cedar Creek in May 2013. However, a proposed change in K.J.'s placement is not immediately conclusive of a due process violation: Plaintiffs were able to, and did, file a Due Process Petition with the Office of Special Education in the New Jersey Department of Education to challenge Defendants' alternative placement. This action allowed Plaintiffs to proceed through an administrative hearing process until they reached a settlement that allowed K.J. to return to Cedar Creek. Plaintiffs fail to show that the due process offered by this administrative proceeding was insufficient, particularly considering that this process resulted in K.J. successfully being returned to Cedar Creek. Accordingly, summary judgment is granted to Defendants only as to procedural due process violations alleged to have occurred after the December 2012 incident.

## C. NJLAD Claims

Plaintiffs allege a number of violations under the NJLAD, including disability discrimination, hostile learning environment, aiding and abetting, and retaliation.[12]

### i.     Disability Discrimination

In their motion for summary judgment, Defendants do not make a separate argument for summary judgment on the NJLAD disability discrimination claim. Rather, the only sentence in

---

[12] At the outset, the Court notes that Plaintiffs' motion for summary judgment asks this Court to grant summary judgment on all four claims under the NJLAD, yet it only sets out the legal elements for hostile learning environment, and entirely evades any attempt to set out the legal elements for the other three NJLAD claims (though it vaguely asserts that K.J. was discriminated against in violation of the NJLAD). (Pl. Mot. at 23–33.) The Court declines to grant summary judgment for Plaintiffs on any NJLAD claim, as they have not even listed what the elements of each claim are, much less shown that the undisputed facts in the record support the necessary elements.

Defendants' entire motion relating to this claim states, "For the reasons expressed above in Count I and Count II, Plaintiffs' NJLAD claims must be dismissed." (Def. Mot. at 20.) Because the Court found above that summary judgment is not warranted for Counts I or II, Defendants' argument is unavailing, and summary judgment is denied on this count.

### ii.    Hostile Learning Environment

Plaintiffs allege that Defendant Egg Harbor and individual defendants McGhee, Reina, Ciccariello, and Ragan created a hostile educational environment in violation of the NJLAD.[13] The New Jersey Law Against Discrimination ("NJLAD") provides that

> All persons shall have the opportunity to obtain . . . all the accommodations, advantages, facilities, and privileges of any place of public accommodation . . . without discrimination because of race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, familial status, disability, national origin, sex, gender identity or expression . . . This opportunity is recognized as and declared to be a civil right.

N.J.S.A. 10:5-4. The New Jersey Supreme Court has recognized that, in certain situations, the NJLAD's protections apply to school settings. *See L.W. ex rel. L.G. v. Toms River Reg'l Sch. Bd. of Educ.*, 915 A.2d 535, 540 (N.J. 2007) (finding hostile learning environment claim cognizable for school's failure to address "peer-based, affectional orientation harassment").

To allege hostile learning environment based on disability, a student must show (1) "discriminatory conduct that would not have occurred 'but for' the student's [disability]," (2) "that a reasonable student of the same age, maturity level, and protected characteristic would consider sufficiently severe or pervasive enough to create an intimidating, hostile, or offensive school

---

[13] The NJLAD holds "employers" liable for hostile environment claims. *J.G.*, 2018 WL 3756952 at *6. Additionally, it also "extends liability beyond employers to individuals who aid, abet, incite, compel or coerce the doing of any of the acts that create a hostile environment." *Id.* Consequently, individual liability "for acts of discrimination or for creating or maintaining a hostile environment can only arise through the 'aiding and abetting' mechanism that applies to 'any person.'" *Id.*

Here, Plaintiffs may allege hostile environment against individual defendants, as they allege, albeit in a separate count of the FAC, that these individual Defendants aided and abetted Egg Harbor's conduct. (FAC ¶¶199–205.)

environment," and (3) "that the school district failed to reasonably address such conduct." *Remphrey v. Cherry Hill Twp. Bd. of Educ.*, Civ. No. 16-3084, 2017 WL 253951, at *4 (D.N.J. Jan. 20, 2017) (citing *Toms River*, 915 A.2d at 547). Though *Toms River* dealt solely with harassment and bullying from other students, this Court in *Remphrey* used the same analysis for a student's allegations that her teacher harassed her. *Id.*; *see also J.G. on behalf of K.C. v. Hackettstown Pub. Sch. Dist.*, Civ. No. 18-2365, 2018 WL 3756952, at *6 (D.N.J. Aug. 8, 2018) (recognizing as cognizable student's hostile school environment claim alleging that vice principal and school investigator, rather than peer students, were source of harassment). A school district may be "liable for such harassment when the school district knew or should have known of the harassment but failed to take actions reasonably calculated to end the mistreatment and offensive conduct." *Toms River*, 915 A.2d at 540.

Here, Plaintiffs argue K.J. experienced discriminatory conduct due to his disability. Large portions of Plaintiffs' briefs assert that this discriminatory conduct includes Defendants' failure to implement K.J.'s IEP. (Pl. Mot. 24–33; Pl. Resp. 21–25.) To start, the Court notes that failure to implement an IEP is not the type of harassment that courts in this Circuit or in the state of New Jersey have found to support this claim; rather, harassment in this context encompasses student-on-student bullying, *see, e.g., Toms River,* 189 N.J. 381, and physical or verbal harassment by teachers or administrators. *See, e.g., Remphrey*, 2017 WL 253951; *Hackettstown*, 2018 WL 3756952. Rather, Plaintiffs' arguments about failing to implement K.J.'s IEP are more appropriately brought in other causes of action and will not be addressed here. *See, e.g., Melissa S. v. Sch. Dist. of Pittsburgh*, 183 F.App'x 184 (3d. Cir. 2006) (addressing claims of failure to implement a student's IEP under the IDEA).

Considering the other evidence Plaintiffs offer in support of their hostile learning environment claim, this claim fails as a matter of law. Without determining whether Defendants harassed K.J. because of his disability, Plaintiffs have failed to establish that any harassment was "severe or pervasive" enough to make a prima facie case. An example of "severe or pervasive" harassment is illustrated by *Remphrey,* where the court found a teacher's conduct could meet this threshold when the plaintiff alleged that her teacher frequently attempted to touch or hug her, flirted with her inappropriately, and made "similar inappropriate physical conduct and remarks to other female students." 2017 WL 253951 at 4. Similarly, in *E.K. v. Massaro*, Civ. No. 12-2464, 2013 WL 5539357 (D.N.J. Oct. 7, 2013), a teacher's criminal sexual relationship with an eighth-grade student in her class met the "severe and pervasive" standard. In *Hackettstown*, the court found that harassment may have been severe and pervasive when school officials directed harsh homophobic slurs at a homosexual student. 2018 WL 3756952.

Here, the only conduct Plaintiffs specify that the Court may consider for this claim is: Hallman's comment to Cedar Creek students that they should not joke too much with K.J. and throwing away K.J.'s drawing in class, putting out the "all call" to the district in December 2018, prohibiting K.J. from attending a school trip, and prohibiting K.J. from attending prom after he had graduated. (Pl. Resp. at 24.) While these incidents may have each been upsetting to K.J., they do not rise to the level of "severe or pervasive enough to create an intimidating, hostile, or offensive school environment." *See, e.g., D.V. by and through B.V. v. Pennsauken School District*, 247 F.Supp.3d 464 (D.N.J. Mar. 29, 2017) (granting summary judgment to defendants where plaintiff could not show that offensive comments from peers or school personnel rose to the "severe or pervasive" level). In the above cases in which school personnel's conduct was found to rise to this standard, the conduct at issue occurred with greater frequency and was far more

egregious. Because Plaintiffs cannot establish the elements for a hostile environment claim under the NJLAD, summary judgment is granted for Defendants on this count.

### iii.    Retaliation

The NJLAD makes it "unlawful to retaliate against or intimidate any individual because he or she has opposed any act or practice made unlawful by the" NJLAD. *Cottrell v. Rowan Univ.*, 786 F.Supp.2d 851 (D.N.J. 2011) (citing N.J.S.A. 10:5–12(d), (e)). In order to establish a prima facie case of retaliation under the NJLAD, a plaintiff must show that: (1) he was in a protected class; (2) he was engaged in protected activity known to the employer; (3) he was thereafter subjected to an adverse consequence; and (4) there is a causal link between the protected activity and the adverse consequence. *Victor v. State*, 4 A.3d 126 (N.J. 2010).

Plaintiffs assert that the protected activity here was retaining legal counsel in December 2012 and filing their administrative Due Process Action. They claim Defendants retaliated against this action by attempting to expel K.J., providing him inadequate homebound instruction, refusing to permit K.J. to return to Cedar Creek in May 2013, barring K.J. from attending a field trip or prom, failing to provide K.J. with assistance or support when he returned to Cedar Creek, and attempting to exclude him from graduation.

Defendants assert that they did not try to expel K.J.; rather, they attempted to find an alternative placement for K.J. (Doc. 171 ("Def. Reply") at 13–14.) They argue that a recommendation for alternative educational placement cannot constitute retaliatory adverse action, particularly since K.J. returned to Cedar Creek. (Def. Reply at 14.) Defendants assert that K.J. did walk in his graduation, was only barred from prom after his graduation, and that the field trip he wished to attend was cancelled, so no student attended. (*Id*.) Defendants contend that Plaintiffs provide no details as to how K.J. was deprived of support upon returning to Cedar Creek. (*Id*.)

The Court agrees with Plaintiffs' argument that an alternative educational placement could constitute an adverse action. *See A.S. v. Harrison Twp. Bd. of Educ.*, Civ. No. 14-147, 2015 WL 5769985, at *9 (D.N.J. Sept. 29, 2015) (finding that the defendants' attempt to affect a student's educational placement could constitute adverse action). However, summary judgment is nonetheless still inappropriate for either party, as neither party has argued the fourth element— causal link between protected activity and adverse action—in full.[14] Summary judgment is denied.

### iv.     Aiding and abetting

"The NJLAD prohibits any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under the act." *Ross v. Amazon.com, Inc.*, Civ. No. 19-1864, 2019 WL 1227112, at *2 (D.N.J. Mar. 14, 2019) (citing N.J. Stat. Ann. § 10:5–12(e)). To establish an aiding and abetting claim under the NJLAD, a plaintiff "must demonstrate that the defendants: (1) aided another in performing a wrongful act that caused an injury; (2) were aware of their role in the illegal activity at the time it was committed; and (3) knowingly and substantially assisted with the main violation." *Yuli v. Lakewood Bd. of Educ.*, Civ. No. 13-4617, 2014 WL 5308187, at *9 (D.N.J. Oct. 16, 2014). An individual cannot be held liable for aiding and abetting unless there is an underlying violation of the NJLAD. *See Monaco v. Am. Gen. Assurance Co.*, 359 F.3d 296, 307 n. 15 (3d Cir.2004) ("[I]nasmuch as we hold that the

---

[14] Defendants include one sentence in their reply brief asserting that Plaintiffs do not link their obtaining legal representation with any alleged retaliatory act. However, Defendants do not address Plaintiffs' filing of the Due Process Petition. This one-off line about there being no causal link is not enough for the Court to find that Plaintiffs have failed to make a prima facie case.

Plaintiffs vaguely suggest a causal link between the filing of the Due Process Petition and K.J.'s inability to return to Cedar Creek; however, neither party has engaged in the next steps of a retaliation claim analysis, so the Court cannot determine if summary judgment is warranted for Plaintiffs.

Retaliation under the NJLD is subject to the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973): if a plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. If the defendant can do so, the burden shifts back to the plaintiff, who must show that the defendant's proffered reason is pretextual. *See Sgro v. Bloomberg L.P.*, 331 F. App'x 932, 937 (3d Cir. 2009). Here, even if the Court found that Plaintiffs had established a prima facie case, neither Plaintiffs nor Defendants have engaged in these next steps, making summary judgment inappropriate.

district court correctly granted summary judgment to the corporate defendants, any claim [plaintiff] brought against the individual defendants for aiding and abetting fails as well.") Finally, the NJLAD "does not impose individual liability upon non-supervisory employees." *Ross*, 2019 WL 1227112 at *2.

Plaintiffs' aiding and abetting claim, as stated in the FAC, alleges that all Defendants in Counts XII (Hostile Learning Environment in violation of NJLAD) and XIII (aiding and abetting in violation of NJLAD) "by their separate conduct against Plaintiffs and K.J. aided and abetted each other in violation of" the NJLAD. (FAC ¶200.) Despite only naming Counts XII and XIII, this count in the FAC goes on to allege that the Defendants aided and abetted disability discrimination (Count XI) and retaliation (Count XIV).

Defendants' sole, one-sentence-long argument for summary judgment on this count is that "aiding and abetting[] does not allege an independent cause of action and must be dismissed." (Def. Mot. at 21; Def. Reply at 13.) This abbreviated argument misunderstands the law. As is clear from a cursory glance at this Court's recent cases interpreting the NJLAD, persons may be held liable for aiding and abetting underlying violations of the NJLAD. *See, e.g., Andre v. Trinity Health Corp.*, Civ. No. 18-03183, 2019 WL 1198959, at *4–5 (D.N.J. Mar. 14, 2019) (declining to dismiss a count of aiding and abetting under the NJLAD, because the "NJLAD states in pertinent part that it shall be unlawful for any person, whether an employer or not, to aid, abet, incite, compel or coerce the doing any of the acts forbidden under this act, or to attempt to do so"); *Michalak v. ServPro Indus., Inc.*, Civ. No. 18-01727, 2019 WL 3562690 (D.N.J. Aug. 6, 2019) (recognizing as valid a claim for "aiding and abetting discriminatory conduct" under the NJLAD). Summary judgment is denied on Count XIII.

### D. Vicarious Liability

In another one-sentence section of their brief, Defendants argue that summary judgment must be granted on Count XV, Plaintiffs' claim of vicarious liability, as it "does not allege an independent cause of action." (Def. Mot. at 22; Def. Reply at 15.)

In Count XV, Plaintiffs allege that Ciccariello, Reina, Ragan, and McGhee are all "supervisors," and as such Egg Harbor is liable for their "participation and acceptance of discriminatory behavior of upper management and harassment of KJ due to his disability." (FAC ¶¶216–225.) Plaintiffs argue that they have listed this as a separate count in order to specifically claim that Egg Harbor is liable for these individual Defendants' actions detailed in prior counts of the FAC. Claims against these individual Defendants survive in several of Plaintiff's other claims.

In *Sherman v. John Brown Ins. Agency, Inc.*, 38 F.Supp.3d 658, 669 (W.D. Pa. 2014), the court permitted vicarious liability to be brought as a separate claim when it incorporated the rest of the complaint, including underlying claims which would be vicariously "imputed to the employer." As Defendants have set out no argument in their one-sentence section on Count XV as to why this should not be permitted here, summary judgment is denied.[15]

### E. Intentional Infliction of Emotional Distress ("IIED")

To state a claim for IIED under New Jersey law, a plaintiff must allege that the defendant (1) acted intentionally or recklessly and (2) outrageously, and (3) proximately caused (4) severe distress. *Buckley v. Trenton Saving Fund Soc*., 111 N.J. 355, 366 (1988). Regarding the first element, the defendant "must intend both to do the act and to produce emotional distress." *Id*. Next, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized

---

[15] Summary judgment is also denied for Plaintiffs, as summary judgment has not been granted for Plaintiffs on any claims against individual Defendants that would support a theory of vicarious liability.

community." *Id.* (quoting Restatement (Second) of Torts § 46 cmt. d).[16] If the Court determines that the defendant's actions proximately caused the plaintiff's emotional distress, the plaintiff must then show the distress suffered was "so severe that no reasonable man could be expected to endure it." *Buckley*, 111 N.J. at 366-67 (quoting Restatement (Second) of Torts § 46 cmt. j).

Plaintiffs argue that Defendants knew that severe distress would result from suspending K.J. in October 2011, from reporting K.J.'s drawing in December 2012, and from attempting to place K.J. in an alternative educational placement following the dismissal of his criminal charges. (Pl. Mot. 33–35.) They claim that these actions caused K.J.'s parents to divorce, caused K.J.'s siblings' emotional and educational well-being to suffer, and caused K.J. continuing severe emotional distress.

Plaintiffs' claims fail as a matter of law. As Defendants correctly argue, the individual Defendants' actions were not so outrageous as to meet the notably high threshold of an IIED claim.[17] Summary judgment is thus granted for Defendants on this claim. *See, e.g., Worster v. Tropicana Entm't, Inc.*, Civ. No. 13-198, 2016 WL 4919266, at *7 (D.N.J. Sept. 12, 2016)

---

[16] *See also 49 Prospect St. Tenants Ass'n v. Sheva Gardens, Inc.*, 227 N.J. Super. 449, 471-72 (App. Div. 1988) ("The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' . . . .The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.") (quoting Restatement (Second) of Torts § 46 cmt. d).

[17] To illustrate further why Plaintiffs' IIED claim must fail: against Defendant Tarr, Plaintiffs' allege her outrageous conduct was stopping K.J. from going on the class trip to the Smithsonian; against Defendant Hallman, Plaintiffs allege that she "gave him poor grades," without explaining whether or why the grades were unwarranted; against Defendant Ragan, Plaintiffs allege that he "failed to stop" the school from suspending K.J., and so on. (Pl. Resp. at 37–39.) These examples, along with those in Plaintiffs' other briefs, are clearly not so "extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community." *49 Prospect St. Tenants Ass'n*, 227 N.J. Super. at 471-72.

(granting summary judgment for Defendants on an IIED claim where there was "no showing that Defendants' actions or inactions rose to the level of 'extreme' or 'outrageous'").

## F. Negligence

Defendants argue that summary judgment must be granted on Count XX—"Negligence, Gross Negligence, and Respondeat Superior"—because it "relates to Plaintiff's prior malicious prosecution claim, which was dismissed." (Def. Mot. at 23.) Plaintiffs contend that this claim survives as to Reina, McGhee, Ragan, Ciccariello, Ottepka, and Valentine, because they were negligent and/or grossly negligent in their dealings with K.J.

This Court's Opinion dated December 30, 2016 dismissed Count XX as to the prosecutor defendants in this case; however, it did not comment on Count XX as asserted against any other Defendant. Clearly, as Defendants erroneously state that this claim was previously dismissed, summary judgment is inappropriate for Defendants.[18]

Plaintiffs' motion for summary judgment on this count is denied as well. Plaintiffs' arguments that Defendants were negligent in their treatment of K.J. are vague, and apparently rely on their prior arguments that K.J.'s "civil and procedural due process rights were violated." [19] (Pl. Mot. at 37.) As detailed above, this Court has either granted summary judgment for Defendants,

---

[18] In their motion for summary judgment, Defendants rely on this Court's December 30, 2016 Opinion to claim that because "all tort based claims have been dismissed," all derivative claims must also be dismissed. (Def. Mot. at 23.) The Court does not address this argument; as stated above, the negligence claim was not dismissed by this Court's earlier Opinion.

[19] For example, Plaintiffs state "the actions of all of the named defendants were negligent as they had a duty of care toward K.J., Jr. and they breached their duty of care causing damages to him" and assert that Reina, McGhee, Ragan, Ciccariello, Ottepka, and Valentine "all actively breached their duty of care toward K.J., Jr. and knew or should have known that their actions were in violation of that duty of care, constituting gross negligence." (Pl. Mot. at 36.) Yet, after making these vague assertions, the only example of negligence Plaintiffs offer is that Christine Reina did not provide K.J. with appropriate home instruction. Christine Reina is not even listed as a Defendant in Count XX, and Plaintiffs do not argue that Egg Harbor is vicariously liable for her actions, so the Court is unsure of the relevance of this example. The Court declines to dig through the record and construct arguments for Plaintiffs as to how all of the named Defendants' actions might meet the elements of a negligence claim.

or declined to grant summary judgment to either party on Plaintiffs' other claims. Thus, Plaintiffs cannot use those claims as conclusive proof of negligence in their motion for summary judgment.

## IV.    CONCLUSION[20]

For the foregoing reasons, Plaintiffs' motion for summary judgment is denied, and Defendants' motion for summary judgment is granted only as to the following counts: Count III (Violation of NJCRA) only as to the First Amendment and Fourth Amendment violations alleged, Count V (§ 1983 claim for violation of the Fourth Amendment), Count VI (§ 1983 claim for violation of the First Amendment), Count VII (§ 1983 claim for violation of the Fourteenth Amendment) only as to the alleged due process violations following the December 2012 incident, Count XII (NJLAD hostile learning environment), and Count XVI (IIED). The remainder of Defendants' motion is denied. A corresponding Order will follow.


Dated:            12/16/2019                                    /s Robert B. Kugler
                                                               ROBERT B. KUGLER
                                                               United States District Judge

---

[20] Plaintiffs set out a separate section at the end of their motion for summary judgment, in which they argue they are entitled to summary judgment because Defendants "failed to depose Plaintiffs' experts or dispute their determinations in any matter." (Pl. Mot. at 37–39; Doc. 170 ("Pl. Reply") at 15.) However, they also seem to seek this Court's determination that it is necessary for a jury to hear expert testimony at trial – a request at odds with Plaintiffs' statement that they are entitled to summary judgment. (*Id.*) Like Defendants (Def. Resp. at 20), the Court cannot surmise what Plaintiffs seek in this section of their briefs, and accordingly does not address the substance of any arguments here. If Plaintiffs have a request concerning expert witnesses, they should bring this as a separate motion when appropriate.